# EXHIBIT A

 CT Corporation

**Service of Process Transmittal**
11/22/2019
CT Log Number 536692781

TO: Elena Garnica
NETFLIX, INC.
100 Winchester Cir
Los Gatos, CA 95032-1815

RE: **Process Served in California**

FOR: Netflix, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | MONIQUE HICKS, etc., Pltf. vs. NETFLIX, INC., etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Proof, Order, Attachment |
| **COURT/AGENCY:** | Los Angeles County - Superior Court - Hill Street, CA<br>Case # 19STCV40934 |
| **NATURE OF ACTION:** | Employee Litigation - Discrimination |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/22/2019 at 13:42 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | David M. deRubertis<br>The deRubertis Law Firm, APC<br>4219 Coldwater Canyon Avenue<br>Studio City,, CA 91604<br>818-761-2322 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 11/23/2019, Expected Purge Date: 11/28/2019<br><br>Image SOP<br><br>Email Notification,  Elena Garnica  egarnica@netflix.com<br><br>Email Notification,  AMIE NGUYEN  amien@netflix.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>1999 Bryan St Ste 900<br>Dallas, TX 75201-3140 |
| **For Questions:** | 877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

Electronically FILED by Superior Court of California, County of Los Angeles on 11/14/2019 08:36 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Barel,Deputy Clerk

19STCV40934

# SUMMONS
## *(CITACION JUDICIAL)*

**SUM-100**

| | |
|---|---|
| | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

NETFLIX, INC., a Delaware corporation; and DOES 1 through 50, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

MONIQUE HICKS, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>Los Angeles Superior Court – Stanley Mosk Courthouse<br>111 North Hill Street<br>Los Angeles, CA 90012 | **CASE NUMBER:**<br>*(Número del Caso):*<br>**19STCV40934** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

David M. deRubertis (SBN 208709) | The deRubertis Law Firm, APC
4219 Coldwater Canyon Avenue, Studio City, California 91604                    (818) 761-2322

| | | |
|---|---|---|
| DATE:<br>*(Fecha)*     11/14/2019 | Clerk, by Sherri R. Carter Executive Officer / Clerk of Court<br>*(Secretario)*          Marita P. Barel | , Deputy<br>*(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* Netflix, Inc. a Delaware Corporation;

under: ☒ CCP 416.10 (corporation)            ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
       ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 11/22/19

[SEAL]

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov<br>Westlaw Doc & Form Builder™ |

19STCV40934

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Holly Fujie

Electronically FILED by Superior Court of California, County of Los Angeles on 11/14/2019 08:36 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Barel,Deputy Clerk

1   David M. deRubertis, State Bar No. 208709
    Garen R. Nadir, State Bar No. 285394
2   **The deRubertis Law Firm, APC**
    4219 Coldwater Canyon Avenue
3   Studio City, California 91604
    Telephone:     (818) 761-2322
4   Facsimile:     (818) 761-2323
    E-Mail: David@deRubertisLaw.com
5   E-Mail: Garen@deRubertisLaw.com
6
    Alan I. Schimmel, State Bar No. 101328
7   Michael W. Parks, State Bar No. 154531
    Arya Rhodes, State Bar No. 299390
8   **Schimmel & Parks, APLC**
    15303 Ventura Blvd., Suite 650
9   Sherman Oaks, California 91403
    Telephone:     (818) 464-5061
10  Facsimile:     (818) 464-5091
    E-Mail: MWParks@spattorneys.com
11
12
    Attorneys for Plaintiff
13  Monique Hicks
14          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
15        **IN AND FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**
16

| | |
|---|---|
| MONIQUE HICKS, an individual, | Case No.: |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1.  Race Discrimination (Disparate Treatment) in Violation of the Fair Employment and Housing Act (Gov. Code § 12940, *et seq.*); |
| NETFLIX, INC., a Delaware corporation; and DOES 1 through 50, inclusive, | 2.  Race Discrimination (Disparate Impact) in Violation of the Fair Employment and Housing Act (Gov. Code § 12940, *et seq.*); |
| Defendants. | 3.  Sex/Gender Discrimination (Disparate Treatment) in Violation of the Fair Employment and Housing Act (Gov. Code § 12940, *et seq.*); |
| | 4.  Sex/Gender Discrimination (Disparate Impact) in Violation of the Fair Employment and Housing Act (Gov. Code § 12940, *et seq.*); |
| | 5.  Retaliation in Violation of the Fair Employment and Housing Act (Gov. Code § 12940, *et seq.*); |

1

COMPLAINT

6.  Failure to Prevent Discrimination and Retaliation in Violation of the Fair Employment and Housing Act (Gov. Code § 12940, *et seq.*);
7.  Discrimination Based on Race/Ethnicity/Color/Ancestry (42 U.S.C. § 1981);
8.  Retaliation (42 U.S.C. § 1981);
9.  Discrimination in Violation of the Unruh Civil Rights Act (Cal. Civ. Code §51);
10. Unfair Business Practices (Cal. Bus. & Prof. Code § 17200, *et seq.*)

**JURY TRIAL DEMANDED**

Plaintiff, MONIQUE HICKS, hereby alleges against Defendants NETFLIX, INC., a Delaware corporation; and DOES 1 through 50, inclusive, as follows:

## INTRODUCTION

1.      Black women earn only sixty-one cents ($.61) for every one dollar ($1.00) that a white male earns.  Some may think that this pay inequity is limited to lower paid workers.  But this case shows that it is not.  The pay gap for Black women cuts across the economic spectrum affecting low paid workers and highly compensated ones alike.

2.      Looking to corner the market, in recent years Defendant Netflix has aggressively expanded its reach into the online comedy streaming market.  Plaintiff Monique Hicks (known professionally as Mo'Nique) is an Oscar-winning actress who headlined the famous *Queens of Comedy* Tour.  In the words of one of the Netflix's executives who recruited Mo'Nique, she is "a legend."  Given Netflix's ambition in the online comedy market, and Mo'Nique's stature in the field as a leading Black female comedian, it only made sense that Netflix would recruit Mo'Nique for one of its comedy specials.  And that is precisely what happened.

3.      Netflix courted Mo'Nique, saw what she had to offer and made her an offer.  But the offer Netflix made Mo'Nique wreaked of discrimination; it perpetuated the pay gap suffered by Black women.

4.      Mo'Nique objected to Netflix's discriminatory pay offer, pointed out how it was discriminatory and asked Netflix to do the right thing by negotiating fair pay with her. In response, Netflix did the opposite. It dug its heels in the ground, refused to negotiate fairly and stood behind its discriminatory offer. In stark contrast, when a white female comedian objected to her offer (given how much lower it was than comparable males), Netflix reconsidered and upped her offer. In short, as this lawsuit shows, Netflix's treatment of Mo'Nique began with a discriminatory low-ball offer and ended with a blacklisting act of retaliation. This lawsuit seeks to correct these wrongs, bring fair and non-discriminatory pay to Mo'Nique and stop Netflix's discriminatory practices going forward.

## GENERAL ALLEGATIONS

5.      Plaintiff MONIQUE HICKS (known professionally as Mo'Nique and hereinafter referred to as "Mo'Nique") is an African American actress and comedian and an adult resident of the State of Georgia.

6.      Defendants NETFLIX, INC., and DOES 1 through 50 inclusive, were corporations, associations, partnerships, joint ventures, or other business entities who at all times herein mentioned conducted business in the State of California and throughout the County of Los Angeles. Said Defendants, through their agents or employees, made unlawful employment decisions relating to Plaintiff within the County of Los Angeles.

7.      The true names, identities, or capacities whether individual, corporate, associate, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to the Plaintiff, who therefore sue said Defendants by such fictitious names. When the true names, identities or capacities of such fictitiously designated Defendants are ascertained, Plaintiff will ask leave of this Court to amend this Complaint and to insert said true names, identities, and capacities, together with the proper charging allegations.

8.      Plaintiff is informed and believes and thereon alleges that each of the Defendants sued herein as a DOE is responsible in some manner and liable herein for negligent, wanton, reckless, and tortious conduct, strict liability, and by such wrongful conduct, proximately caused

1   the Plaintiff's injuries and damages.

2        9.      Plaintiff is informed and believes and thereon alleges that at all relevant times each

3   of the Defendants was the integrated enterprise, joint employer of Plaintiff and was engaged with

4   some or all of the other Defendants in a joint enterprise for profit, and bore such other

5   relationships to some or all of the other Defendants so as to be liable for the conduct of them.

6   Plaintiff performed services for each and every one of Defendants, and to the mutual benefit of all

7   Defendants, and all Defendants shared control of Plaintiff as employers, either directly or

8   indirectly, and of the manner in which Defendants' business was conducted.

9        10.     At all times herein mentioned, Defendants (whether or not specifically identified or

10  designated herein as a DOE Defendant), and each of them, were the agents, employees, servants,

11  partners, independent contractors, joint venturers, and/or participants with all other Defendants,

12  and with each other, and in doing the things hereinafter mentioned, were agents, employees,

13  servants, partners, and joint venturers and/or acted with the consent and permission of the co-

14  Defendants, and each of them.

15       11.     This action lies properly in this judicial district because the unlawful employment

16  practices complained of herein occurred within this district.  As detailed herein, the negotiations

17  for employment occurred in California, the employment services were to be provided in California

18  and California was therefore where the unlawful practices alleged herein occurred.

19       12.     Plaintiff timely filed charges against all named Defendants with the California

20  Department of Fair Employment and Housing (DFEH) and has received a Right-to-Sue letter from

21  the DFEH regarding all applicable claims asserted in this action.  Accordingly, Plaintiff has fully

22  exhausted her administrative remedies as to such claims.

23

24                              **FACTUAL ALLEGATIONS**

25

26  A.     **The historical pay discrimination against Black women produces a
        substantial pay gap between Black women and literally all other
        workers.**

27

28       13.     The gender pay gap is real and severe.  According to the U.S. Census bureau, a

1  full-time working woman earns about eighty cents ($.80) for every dollar a working man earns.

2  That is bad enough, but the reality is much worse for Black women.  Black women earn only

3  sixty-one cents ($.61) on the dollar compared to White males.[1]  As a result, based on today's wage

4  gap, a Black woman working a forty (40) year career stands to earn one million dollars

5  ($1,000,000.00) less than a White, non-Hispanic man.[2]

6        14.    The pay gap for Black women has persisted for as long as data is available.  In

7  1967, the earliest year for which data are available, a Black woman working full-time, year-round

8  typically made only forty-three cents ($.43) for every dollar made by a White male.[3]  In 2017, fifty

9  (50) years later, that gap had narrowed by only eighteen cents ($.18).[4]

10        15.    While the gap has narrowed slightly within the past half-century, experts predict

11  that, if current wage trends continue, it may take another hundred years from now for Black

12  women to achieve pay parity (when measured against their White male coworkers).[5]

13        16.    To put this disparity into even more concrete terms, August 22, 2019 was Black

14  Women's Equal Pay Day.  Far from a celebration, this day – August 22nd – is significant for an

15  invidious reason: it represents the day on which Black women who began working on January 1,

16  2018 would earn as much as a White male earned in 2018 alone.  In other words, Black women

17  will have to have worked all of 2018 and through August 22, 2019 to earn what White men earned

18  in 2018 alone.[6]

19        17.    The pay gap produces real, tangible, and stark consequences.  Black women have

20  less money to support themselves and their families, less money to save and invest for the future,

21  and less money to spend on goods and services.

22

23  [1] See National Women's Law Center, "The Wage Gap for Black Women: Working Longer and
Making Less," August 2019, available at https://nwlc-ciw49tixgw5lbab.stackpathdns.com/wp-

24  content/uploads/2019/08/Wage-Gap-for-Black-Women.pdf.

25  [2] See Ibid.

  [3] See Ibid.

26  [4] See Ibid.

27  [5] See https://iwpr.org/issue/employment-education-economic-change/pay-equity-discrimination.

28  [6] See https://www.chicagotribune.com/opinion/commentary/ct-opinion-equal-pay-black-women-
20190819-h2ctbj7xfvccnny6muc7nlqsnm-story.html.

18.     In recent years, pay equity concerns (both gender and gender/race) have blossomed in many industries from entertainment, to sports, to Wall Street, with the birth of the #timesup movement.  Unfortunately, as detailed below, this lawsuit shows that pay equity problems still persist deeply in Hollywood, including in one of Hollywood's most innovative companies: Netflix.

**B.      Netflix's corporate culture:  a lack of racial diversity and frequent racial insensitivity at the highest levels of senior leadership.**

19.     Netflix has maintained a corporate culture – reaching the highest levels of senior leadership – that has been insensitive to Black workers.  Relatedly, the company has been plagued by a lack of racial diversity within senior leadership, as well as across the organization.  Some examples, offered by way of illustration and not by way of limitation, are set forth below.

**1.      Netflix's undeniable lack of internal diversity at the highest levels of the corporation.**

20.     Netflix has been, and still is, plagued by a lack of diversity at the highest levels of the corporation's senior leadership.

21.     Netflix's own website lists its key "Management Team" and "Officers":  Founder and Chief Executive Officer (CEO) Reed Hastings; Chief Talent Officer Jessica Neal; Chief Communications Officer Rachel Whetstone; General Counsel David Hyman; Chief Product Officer Greg Peters; Chief Financial Officer Spencer Neumann; and Chief Content Officer Ted Sarandos.  The images of the six senior leaders that Netflix displays on its own website share one glaring feature in common:  their complete lack of racial diversity:



Reed Hastings
Founder/CEO



Jessica Neal
Chief Talent Officer



Rachel Whetstone
Chief Communications Officer



David Hyman
General Counsel



Greg Peters
Chief Product Officer



Spencer Neumann
Chief Financial Officer



Ted Sarandos
Chief Content Officer

22.     Not surprisingly, given the lack of diversity (including particularly racial diversity) in key leadership positions within Netflix, not one Netflix executive is listed on Black Enterprise's "300 Most Powerful Executives in Corporate America" even though Netflix is considered an innovative industry leader currently listed as 197 on the Fortune 500.

23.     Netflix's Board of Directors has historically mirrored its senior leadership.  The Board, too, has historically lacked racial diversity.  Instead, it was White-only for years lacking even one Black member – let alone, a Black female.  Then, in January 2018 – after Mo'Nique had already raised questions and concerns regarding Netflix's discriminatory treatment of Black females (including herself) as described below – the company had another opportunity to begin to address the Board's lack of diversity.  Instead, it persisted in its ways – appointing yet another

1   White male (Rodolphe Belmer) as its newest Director. This prompted more public outcry at

2   Netflix's stubborn refusal to address the race problem within its upper ranks.[7]

3        24.     Given the lack of racial diversity at the top, it is not surprising that Netflix's

4   workforce similarly lacks racial diversity across-the-board. In 2018 and 2019 respectively, Netflix

5   reported that only four percent (4%) and six percent (6%) of its workforce being comprised of

6   Black employees. In other words, while its senior management specifically lacks racial diversity,

7   Netflix's workforce generally also underrepresents Black workers compared to the general

8   population.[8]

9        25.     Indeed, Netflix's lack of diversity is notable even when compared to the

10   historically non-diverse studios. For example, in 2017, the Directors Guild of America ranked

11   Netflix last among the ten largest studios and their subsidiaries on its TV Director Diversity

12   Report. Netflix had the worst record of all ten major studios for hiring the lowest percentage of

13   diverse directors – only twenty-nine percent (29%) of Netflix's shows had diverse directors

14   compared to an average of thirty-eight percent (38%) across the industry.[9]

15

16         **2.**     **A senior executive's repeated use of the "n-word" is tacitly accepted and, only upon additional offensive conduct, did CEO Hastings intervene and eventually acknowledge that Netflix had failed to properly handle the situation.**

17

18

19        26.     Upon information and belief, Netflix's historical lack of commitment to executive

20   and employee diversity contributed to a corporate culture of insensitivity and/or discriminatory

21   treatment of Black workers within Netflix's operations. This corporate culture has exposed the

22   racial insensitivity and, in some instances, downright racial improprieties of senior leadership –

23   those who make the ultimate decisions regarding Netflix's operations.

24   [7] On or about March 28, 2018, only after (and presumably in response to) public outcry like that

25   detailed in the text above, Netflix finally announced that it was appointing a woman of color (Ambassador Susan E. Rice) to its Board.

26   [8] Netflix's public data does not identify the percentage of African-American females it employs and, thus, Netflix does not permit an analysis of the degree to which its workforce underrepresents

27   African-American women particularly.

28   [9] *See* https://www.dga.org/News/PressReleases/2017/171114-Episodic-Television-Director-Diversity-Report.aspx.

27.     As one notable example:  Upon information and belief, in approximately early-2018, Netflix's then Chief Communications Officer Jonathan Friedland used the "n-word" in a meeting of approximately sixty (60) members of Netflix's publicity staff.  Reportedly, multiple offended employees lodged complaints regarding the incident, prompting Friedland to apologize, meet with CEO Hastings, and spend an hour discussing the issue with Friedland's own team.  Thereafter, Friedland met with two Black human resource employees about his use of the "n-word."  At this meeting, in recounting his earlier use of the "n-word," Friedland again used the full, offensive epithet.  A few months later, Friedland was invited to, and did speak with, a group of Black employees.  In this meeting, Friedland still did not apologize for nor even acknowledge his earlier offensive conduct.  According to CEO Hastings, Friedland's conduct left "many in the meeting" to interpret Friedland's response "to mean he didn't care and didn't accept accountability for his words."

28.     Only after all of the above did CEO Hastings terminate Friedland and acknowledge in a memo to Netflix employees that Friedland – the corporation's Chief Communications Officer and a key senior leader – "showed unacceptably low racial awareness and sensitivity" and a "deep lack of understanding."  In this same memo, CEO Hastings acknowledged that he – that is, really Netflix as a whole – "should have done more" upon learning of Friedland's conduct but instead allowed the issue to remain unsatisfactorily addressed for too long.  CEO Hastings chalked this up to his own "privilege [that] has made [him] intellectualize or otherwise minimize race issues like this" and he agreed that he, as the Founder and current CEO of Netflix, "need[s] to set a better example by learning and listening more so [he] can be the leader we need."

29.     In the end, according to published reports, Friedland purported to apologize for his conduct but simultaneously seemed to justify his racial insensitivity by the fact that he was "moving at a million miles an hour" at the time (presumably, in doing work for Netflix).

3.     **Netflix reportedly allowed *House of Cards* star Kevin Spacey to repeatedly make racist remarks (including the use of the "n-word") on the set without consequence.**

30.     Upon information and belief, another example of Netflix's corporate culture that

has tolerated racial inequities or indignities occurred on its renowned original series *House of Cards*. *House of Cards* was Netflix's first ever original series and it was one of Netflix's leading original series. Actor Kevin Spacey played the lead role. Eventually, in or about November 2017, Netflix fired Spacey after it was publicly revealed that Spacey had for years committed acts of sexual assault and harassment.

31.     Upon information and belief, before the worldwide allegations of sexually assaultive behavior by Spacey came to public light, Netflix turned a blind eye to other unlawful conduct by Spacey – namely, racial abuse directed at Black employees or contactors working on the show's set. Specifically, during the show's first season in 2012, VIP Protective Services, a professional security company, contracted to provide security services for the show. VIP Protective Services employed a number of guards who were Black.

32.     According to reports from the security company's head (Earl Blue), while on the set Kevin Spacey engaged in a number of racist and offensive acts toward the Black guards including, without limitation and merely by way of illustration:

- Spacey complained to his own personal security personnel: "I don't want [n-words] on my set anymore!";
- Spacey complained he did not "want [n-words] watching my trailer" when he saw Black guards watching a trailer for the show;
- Spacey refused to acknowledge or shake hands of the Black guards; and
- Spacey generally ignored and refused to talk to the Black guards.

33.     According to Blue, he raised concerns about Spacey's racially offensive conduct but the set managers disregarded the concerns retorting, "That's just the way he is; we've got to keep him happy" and referring to Spacey as "the Powers that be." Thereafter, VIP Protective Service's contract was not renewed even though, according to Blue, he had been told by the show's producers that they were pleased with the company's work.

1          **4.      Reports of differential treatment of female executives compared
                      to males.**
2

3          34.     Netflix's corporate culture has also contributed to a lack of gender equality in the

4     workplace.

5          35.     As one example:  Upon information and belief, CEO Hastings asked Netflix's

6     former Chief Talent Officer Tawni Nazario-Cranz to "sunshine" – that is, to publicly explain prior

7     (presumably misguided) decisions – why she had taken some of her team before a launch event in

8     Milan to get their hair and make-up done and expensed the costs.  Netflix's expense-

9     reimbursement policy is simply "Act in Netflix's best interests"; the policy liberally permits

10    employees to decide for themselves appropriate use of their expense accounts.  Thus, Ms. Nazario-

11    Cranz's response was to point out the obvious double-standard: If a manager took two male team

12    members out for a round of golf and expensed the outing, nobody at Netflix would second-guess

13    this decision for a second.

14         36.     Upon information and belief, Ms. Nazario-Cranz pointing out the obvious gender

15    double-standard triggered a discussion of gender inequity in the workplace, but it did not cause

16    Netflix's White male CEO to reconsider his position.  Instead, according to public reports, soon

17    after this encounter with CEO Hastings, Ms. Nazario-Cranz departed from the company raising

18    the question of whether such departure was retaliatory.

19
           **5.      Pay equity disputes on other Netflix shows.**
20

21         37.     Not surprisingly, the effects of the foregoing corporate culture and its

22    discriminatory mindset impacted and influenced pay decisions by Netflix and lead to pay

23    disparities within Netflix.

24         38.     As one example: In or about March of 2018, it was revealed that Netflix had a pay

25    equity problem on its show, *The Crown*.  Specifically, it was reported at that time that Actress

26    Claire Foy, who played the lead role of Queen Elizabeth II, was paid nearly fourteen thousand

27    dollars ($14,000.00) less per episode than male actor Matt Smith, who had a supporting role of

28    Prince Philip.  This blatant pay inequity was unjustifiable.  Indeed, Netflix itself had to concede

the point and ultimately, upon information and belief, paid two hundred and seventy-five thousand dollars ($275,000.00) in back pay to make up for this gender-based pay inequity after it was exposed in the public spotlight.

39.     Faced with this public outrage about gender-based pay inequity within its shows, upon information and belief, Netflix's Chief Content Officer Ted Sarandos publicly declared that the debacle surrounding pay inequity on *The Crown* prompted Netflix to review cast salaries across all of the company's productions (including those done in-house and by third-parties), which revealed that there were other (unspecified) pay inequities beyond just those reported on *The Crown*. Media outlets quoted Sarandos as stating the following (acknowledging the problem of a pay gap within Netflix productions): "[I]n general there was a disparity. What it did for us was it had us go back and look at all of our productions – and all of our productions that were being run by third parties – and make sure that none of those disparities existed." Sarandos also publicly stated that, through this process, Netflix found, and adjusted, a salary of an unnamed female executive who was being paid less than her male counterparts had historically received for the same position.

40.     In short, Netflix has been on notice of its problems with pay equity and the need for it to fix them before it tried to impose similar pay inequity on Mo'Nique as detailed below. Indeed, Sarandos himself was quoted as noting that the pay inequity on *The Crown* "pointed to a bigger problem throughout the industry." This lawsuit is yet another example of this "bigger problem throughout the industry."

**C.     Netflix dominates the stand-up comedy market and has used that market-dominance to suppress wages, and contribute to the wage gap, of Black women.**

**1.     Netflix dominates the stand-up comedy market.**

41.     Netflix proclaims itself as "the world's leading internet entertainment service with over 158 million paid memberships in over 190 countries." Netflix offers its members online streaming of a library of films and television programs, including those produced in-house.

42.     Since 2012, Netflix began taking a more active role producing and distributing its

own original content, including movies, series, and specials.  Its success in doing so has upended the traditional "movie studio" model itself becoming a literal factory for manufactured entertainment products including its original content.

43.    Indeed, each consecutive year, Netflix boosts its annual budget for original content and increases its output of original content.  In 2017 and 2018, Netflix released over 1,000 and 1,500 hours of original content each year, respectively.  By 2019, Netflix sought to have half of its library consist of original content, according to a company announcement.  In 2018 and 2019, Netflix's investment on content reached approximately $12 billion and $15 billion each year, respectively (approximately 85% of which is earmarked for original content).  Netflix's anticipated content spending will hit $17.8 billion in 2020, according to BMO Capital Markets analyst Daniel Salmon.

44.    As Netflix's influence has being felt across film and television, the company aggressively broadened its reach into comedy.  In 2019, Netflix launched a comedy radio channel on Sirius XM and also released *Comedians of the World*, a series featuring 47 comedians[10] from 13 regions.  Where HBO and Comedy Central were once viewed as the destination for comics, Netflix has now emerged as a dominating force that is disrupting the industry.  According to the *Los Angeles Times,* "Netflix is transforming stand-up comedy and making it integral to its future." "Unlike drama, which costs them [Netflix] billions, what they're able to do with standup for $100 million is dominate," says Brian Volk-Weiss, founder of Comedy Dynamics.  "They basically said, let's take everything off the table so that if the public wants to tune in to high-end comedy, it goes to Netflix." "Unless somebody mounts a tremendous counterattack, which is getting increasingly harder," Volk-Weiss says, "Netflix will have utter domination of one of five or six genres that exist."  He goes on to say that "[a] huge piece of the puzzle is that [Netflix Chief Content Officer] Ted Sarandos loves stand-up comedy, and he's got a really nice checkbook."  As this case shows, however, that "really nice checkbook" is not color blind.

45.    In fact, while the sky seems to be the limit when it comes to Netflix's content

---

[10] Among those forty-seven (47) comedians, only six (6) are Black.

1  budget (estimated at $19 billion in 2019), there apparently is a ceiling when it comes to Netflix's

2  willingness to pay talent of certain demographics, namely, Black women.  That pay inequity is

3  what this case is about, and this is the injustice that Mo'Nique seeks to correct by this lawsuit.

4

5  **2.    Mo'Nique and her background as the "Queen of Comedy."**

6    46.    The youngest of four children, Mo'Nique started from humble beginnings.  She

7  first took to the stage in 1988 during an open-mic night at a comedy club in her hometown of

8  Baltimore, Maryland.  Encouraged by the positive reception, she soon began performing at other

9  comedy clubs in Baltimore, Atlanta, and along the East Coast.

10    47.    Eventually, she left her day job and decided to pursue a full-time career in stand-up.

11  Before long, she was opening for musicians and appearing in such television specials as Russell

12  Simmons' Def Comedy Jam and Comic View.

13    48.    After Mo'Nique made popular guest appearances on the television show *Moesha* in

14  1999 and 2000, a spin-off series was created for her character.  She starred for five seasons as

15  Nikki Parker on the sitcom *The Parkers* (1999–2004), a series about a single mom who attends

16  college with her daughter.  The celebrated family sitcom earned Mo'Nique several accolades,

17  including four NAACP Image Awards for Outstanding Actress in a comedy series in 2001, 2002,

18  2004, and 2005.

19    49.    Film roles soon followed, including *Baby Boy* (2001), *Two Can Play That Game*

20  (2001), *Soul Plane* (2004), *Shadowboxer* (2005), Domino (2005), and a starring role in *Phat Girlz*

21  (2006), a romantic comedy.

22    50.    Then, in 2009, Mo'Nique played Mary Lee Johnston, the abusive and violent

23  mother, in *Precious: Based on the Novel 'Push' by Sapphir*e (2009), starring Gabourey Sidibe and

24  directed by Lee Daniels.  Mo'Nique's performance in *Precious* brought her both an Academy

25  Award (Oscar) and a Golden Globe for Best Supporting Actress.

26    51.    In addition to her Oscar-winning performance *Precious*, Mo'Nique also won

27  awards from the Screen Actors Guild, Sundance Film Festival, BET, NAACP, British Academy of

28  Film and Television Arts, African American Film Critics Association, Los Angeles Film Critics

1  Association, and New York Film Critics Circle, among many others.

2      52.    Following her Oscar-winning performance in *Precious*, Mo'nique had other

3  significant roles such as the lead role in *Blackbird*, a coming-of-age film about a young Black

4  singer struggling with his sexuality.

5      53.    Then, in 2015, Mo'Nique was nominated for an Emmy for her supporting role as

6  "Ma Rainey" in the TV movie *Bessie*, a biopic about the American blues singer Bessie Smith.

7      54.    While climbing the Hollywood ranks and performing roles in a variety of genres,

8  Mo'Nique never strayed too far from her comedic roots.  One of her most notable performances to

9  date is when she starred in the hit stand-up comedy film, *The Queens of Comedy*, which follows

10  four Black female stand-up comedians at Memphis, Tennessee's Orpheum Theatre. *The Queens*

11  *of Comedy* was released in 2002 and aired on Showtime.

12      55.    The Queens of Comedy (consisting of Mo'Nique, Laura Hayes, Adele Givens, and

13  Sommore) toured the country, released an album of the same title, and went on to earn a Grammy

14  nomination in 2002 for Best Spoken Comedy Album.

15      56.    That same year, in 2002, Mo'Nique became the first female to host NBC's

16  nationally televised program, *Showtime at the Apollo*.  She carried the legendary torch for three

17  consecutive seasons.

18      57.    Mo'Nique has starred in comedy specials (which happen to be available to stream

19  on Netflix): *Monique: I Coulda Been Your Cellmate* (2007) and *Shaquille O'Neal Presents: All*

20  *Star Comedy Jam: Live From Dallas* (2010).

21      58.    The concept for *The Mo'Nique Show* which started as a nationally syndicated radio

22  show in 2008 eventually evolved into a late-night talk show in 2009, which aired weeknights on

23  Black Entertainment Television (BET).

24      59.    More recently, in 2019, Mo'Nique kicked off a Las Vegas residency at SLS Hotel

25  and Casino.  In doing so, she became the first Black female comedian in history to secure a Las

26  Vegas residency.

27      60.    Despite Mo'Nique's extensive résumé and documented history of comedic success,

28  when Netflix presented her with an offer of employment for an exclusive stand-up comedy

1   special, Netflix made a lowball offer that was only a fraction of what Netflix paid other (non-

2   Black female) comedians.

3

            **3.      Netflix's biased, discriminatory offer to Mo'Nique.**

4

5                   **a.      The offer of employment.**

6          61.     In or about November 2017, Netflix executives – including Benjamin Lynn of

7   Netflix's Original Stand-up Comedy Programming – attended Mo'Nique's live stand-up show at

8   the Improv in Ontario, California.  After the show, Lynn gave Mo'Nique effusive praise for her

9   work and asked for additional tickets reserved for the show the next day so that Caitlin Hotchkiss

10  (Netflix's Coordinator of Original Stand-up Programming) and others could attend Mo'Nique's

11  show.  Lynn made clear that Netflix was considering making an offer to Mo'Nique to work on a

12  Netflix original stand-up show.  The next day, Hotchkiss and others attended Mo'Nique's show.

13  Again, they offered effusive praise about her show.

14         62.     Netflix then began to recruit Mo'Nique.  At this time, Netflix was aggressively

15  ramping-up its stand-up content and trying to dominate the market for original stand-up material.

16  Given her background and history of success, Mo'Nique was precisely the type of talent Netflix

17  should have wanted.  Mo'Nique had a proven track record of success in original stand-up content,

18  had years of filling stand-up venues, was widely regarded as one of the leading Black female

19  comedians of all time, etc.

20         63.     Over the ensuing months, Mo'Nique and her representatives had conversations and

21  communications with various senior leaders within Netflix's Original Stand-up Comedy

22  Programming, including Robbie Praw (Netflix's Director – Original Stand-up Comedy

23  Programming).  During these communications, Netflix representatives made it clear that they

24  understood, knew, and appreciated Mo'Nique's background and proven track record of success.

25  Mo'Nique thus expected to receive an offer commensurate with her background rather than one

26  penalizing her for the color of her skin and her gender.

27         64.     On or about January 11, 2018, Netflix communicated an offer of employment to

28  Mo'Nique.  The offer contemplated employment services to be performed by Mo'Nique in

1  California. The offer's terms were as follows: Netflix would pay Mo'Nique five hundred

2  thousand dollars ($500,000.00) as her "talent fee" for a one-hour stand-up original special

3  Mo'Nique would perform but which Netflix would have complete and total control of the manner,

4  means and method, including: Netflix would own the copyright of the program and control all

5  exhibition rights; Netflix would retain all audio-only rights in and to the special; Netflix would

6  retain all creative and business controls including choice of production company and final cut; for

7  a year after the show's premiere, Mo'Nique would have been prohibited from taping or

8  negotiating with any third party with respect to her next comedy special and, after this one year's

9  outright prohibition, Mo'Nique would still have to give Netflix the first negotiation/first right of

10  refusal after two years in the event Mo'Nique wished to use the content elsewhere; for two years

11  after the premiere, Mo'Nique would be prohibited from performing or using any of the show's

12  material in any recorded program and then after the two years Netflix would still have the first

13  negotiation/first right of refusal in the event Mo'Nique wished to use the content elsewhere.

14         65.    The offer also was expressly to be kept confidential – that is, if she accepted the

15  offer, Mo'Nique would not be permitted to discuss her compensation with others (contrary to

16  Netflix's typical rule that employee compensation is not confidential among the workforce).

17  Instead, she would have to accept a contractual silencing that prevented her from discussing the

18  terms of her offer, including the discriminatory pay proposal within it.

19

20                         **b.      Netflix's offer was clearly discriminatory.**

21         66.    The terms of Netflix's offer to Mo'Nique were discriminatory based on her gender

22  and race/color. The offer tried to perpetuate the drastic pay gap experience by Black women when

23  compared to both men and caucasions.

24         67.    As just a few examples: Upon information and belief, Netflix made offers to other

25  comedic talent yet to perform in similar stand-up shows, but, when the talent was not a Black

26  woman, Netflix offered to pay, and did pay, astronomically more than it pays to Black women like

27  it offered to Mo'Nique. For example, by way of illustration and not by way of limitation:

28            • In or about 2017, Netflix reportedly signed a one hundred million-dollar

($100,000,000.00) deal with Jerry Seinfeld (a White male), which included in part payment for a stand-up special.

• In or about 2019, Netflix reportedly is currently in negotiations, or signed a deal, with Eddie Murphy (a Black male) estimated at sixty to seventy million-dollar ($60,000,000.00 - $70,000,000.00).

• In or about 2016, Netflix reportedly signed a sixty million-dollar ($60,000,000.00) deal with Dave Chapelle (a Black male) for a three-special deal, representing compensation of twenty million dollars ($20,000,000.00) per show.

• In or about 2016, Netflix reportedly signed a forty million-dollar ($40,000,000.00) deal with Chris Rock (a Black male) for a two-special program, representing compensation (like Chapelle's) of twenty million dollars ($20,000,000.00) per show.

• In or about 2017, Netflix reportedly signed a twenty million-dollar deal with Ellen DeGeneres (a White woman) for a one-time comedy special.

• In or about 2017, Netflix reportedly signed a sixteen million five hundred thousand-dollar ($16,500,000.00) deal with Jeff Dunham (a White male) for a one-hour comedy special.

• In or about 2016, Netflix reportedly signed a two-show deal with Ricky Gervais (a White male) for forty million dollars ($40,000,000.00), again representing compensation (like Chappelle's and Rock's) of twenty million dollars ($20,000,000.00) per show.

• In or about 2017, Netflix initially offered Amy Schumer (a White female) eleven million dollars ($11,000,000.00) as her compensation for her hour-long special comparable to the one proposed to Mo'Nique. Reportedly, Schumer leveraged the fact that Netflix offered so much more to both Chapelle and Rock to get Netflix to increase her offer to thirteen million dollars ($13,000,000.00), an increase of over fifteen percent (15%) of the original offer.

68.     Thus, Netflix reportedly offered or paid Rock, Chapelle, Degeneris, and Gervais forty (40) times more per show than it offered Mo'Nique, and it offered Schumer twenty-six (26) times more per show than Mo'Nique. In short, Netflix's offer to Mo'Nique perpetuates the drastic

wage gap forced upon Black women in the America's workforce.

### 4. Mo'Nique's protected activities and Netflix's retaliatory refusal to negotiate with her.

69. In response to this discriminatory offer, Mo'Nique objected and engaged in other legally-protected opposition.

70. Both personally and through her representatives, Mo'Nique pushed back on the terms of the offer, calling out Netflix for discriminating against Black women.

71. Initially, with her explicit authorization and acting on her behalf, Mo'Nique's representatives wrote Netflix's executives pleading that they reconsider the "racially and gender biased offer" and noting that Mo'Nique was "blindsided" by it. Mo'Nique's representatives questioned "what makes Mo'Nique, who has been labeled a living legend based on her awards from around the world, her tenure in the game, and her diverse body of work … somehow … worth $12,500,000 less than Amy Schumer to [Netflix]?" Mo'Nique's representatives pointed out that her Black male counterparts were even paid seven million dollars ($7,000,000.00) more per show than Schumer, all of which drove home the point that it made no sense for Mo'Nique to be offered only five hundred thousand dollars ($500,000.00) for similar work.

72. Netflix responded that it purportedly took "very seriously" the concerns raised in the email. It thus agreed to have a call with Mo'Nique's representatives to discuss her concerns.

73. On January 17, 2018, Mo'Nique's representatives had a call with, *inter alia*, Robbie Praw (Netflix's Director – Original Stand-up Comedy Programming). In this call, like in the prior communications, Mo'Nique's representatives inquired as to how Netflix had arrived at its pay valuation for Mo'Nique compared to others explaining the concern that Mo'Nique viewed the offer as discriminatory based on her race/color and gender. In explaining why the offer was so low in their view, Mo'Nique's representatives reviewed some of her body of work and her history of success, only to be met with the claim that Netflix does not look at "résumés" or "bodies of work" to arrive at pay offers but rather uses an "assumptive approach." Yet, moments later, when justifying paying Amy Schumer (a White woman) twenty-six (26) times more than Mo'Nique for

comparable work, Praw justified the disparity by citing the facts that Schumer had sold out
Madison Square Garden and had a recent movie released. Mo'Nique's representative replied that
Netflix was citing Schumer's résumé or "body of work" to justify her pay but at the same time
claiming that it did not look at résumés or "bodies of work" and, therefore, it would refuse to look
at Mo'Nique's to make a fair pay offer to her. Obviously, this made little sense. Pressed
repeatedly, Praw stuck to Netflix's party line: Based on its "internal data," Netflix uses an
"assumptive approach" or "anticipatory approach" and that the company "had a process and that's
the way we do it," steadfastly refusing to negotiate reasonable terms or reconsider the lowball,
discriminatory offer.

74.   At all times during these discussions, Netflix executives (including Praw) made
clear that they had the highest respect for Mo'Nique and that they were well aware of her
outstanding career. In fact, during one discussion, Praw himself acknowledged "I want you to
know I know Mo'Nique is a legend. She is." Still, they stubbornly refused to make a fair and
equitable pay offer to Mo'Nique.

75.   Indeed, Netflix simply refused to engage in any negotiation and presented its offer
on "take-it-or-leave-it" terms. Upon information and belief, in other similar situations involving
males and caucasions, Netflix has negotiated increased offers.

76.   Mo'Nique herself engaged in additional protected conduct. Among other things,
she personally spoke out publicly about the discriminatory offer and called for a boycott of
Netflix, including raising the concern that if she did not speak up and out for pay equity for Black
women, she would merely be perpetuating the pay equity gap for Black women rather than
working to change the inequities for future generations. In Mo'Nique's words: "I couldn't accept
that low offer because if I did … I couldn't sleep at night. If I accepted $500,000, what does
Tiffany Haddish have coming? If I accept that, what does the Black female comedian have
coming? Because what they'll say is, 'Mo'Nique accepted this and she's got that.' So what do
they have coming?"

77.   Unfortunately for Mo'Nique and many other women of color, their challenges
when speaking up about pay gap inequality are all the greater because they are met with

1  skepticism, not empathy, when they ask for more money.  We celebrated victories of many

2  talented actresses like Emmy Rossum, Jennifer Lawrence, and Ellen Pompeo publicly aired their

3  financial grievances against networks and studios who paid their male colleagues more money

4  than them.  This has not been the case for Mo'Nique who to this day has not been made a fair and

5  non-discriminatory offer by Netflix.

6

7

8

9

    5.    **Netflix made other discriminatory, lowball offers to other Black female comedians.  But, unlike with Mo'Nique, Netflix has subsequently negotiated with, and increased its offer to, at least one of them after Mo'Nique's call for a boycott of Netflix over its pay inequity practices toward Black women.**

10  78.    Mo'Nique was not the only Black women who has had to suffer Netflix's gender-

11  and race-based pay inequity.

12  79.    After Mo'Nique went public revealing the discriminatory offer, fellow comedian

13  Wanda Sykes (also a Black female) acknowledged that she, too, was "offended" at Netflix's "low-

14  ball[]" offer to her and, in response, "found another home" for her comedy specials.  Upon

15  information and belief, thereafter – and only after Mo'Nique call for a boycott of Netflix – Netflix

16  reconsidered and eventually offered Sykes a better and more equitable deal.  In Sykes words,

17  "They moved that comma."

18  80.    In contrast, despite having re-negotiated a more favorable deal with Sykes, to this

19  day Netflix retaliatorily has refused to do the same for Mo'Nique and, instead, has to this day

20  refused to make a fair, equitable, and non-discriminatory offer to Mo'Nique – the most vocal,

21  outspoken critic of Netflix's pay inequity practices.

22

23

24

    6.    **Netflix's algorithm or other pay determination criteria have an adverse and detrimental impact on the pay of Black female talent.**

25  81.    Upon information and belief, Netflix determines the pay it will offer talent such as

26  Mo'Nique at least in part through an algorithm or other pay determination criteria (such as

27  Netflix's reported "internal data") that adversely and detrimentally impacts Black female talent by

28  arriving at pay calculations for Black female talent that are less than those for non-Black women.

The adverse impact that Netflix's pay determination criteria has on pay determinations of pay for Black female talent is not justified by any lawful consideration.

**D.      Too little, too late:  Netflix finally acknowledges *some* of its diversity problem.  But it stands behind its discriminatory offer to Mo'Nique.**

82.     Upon information and belief, after Mo'Nique's opposition to Netflix's inequitable pay practices, Robbie Praw (Netflix's Director – Original Stand-up Comedy Programming) was asked about the fact that Netflix had not produced any hour-long stand-up shows by Black women in 2017 or 2018.  Praw reportedly replied, "I think we have a responsibility, but it's also what our members want."  The next day, Praw reportedly clarified his comments by conceding that programming so few Black women has been a failure by Netflix.  At or around the same time, Praw also reportedly acknowledged that Mo'Nique's had made an important contribution to the pay equity conversation, but stubbornly maintained that, "There just wasn't a deal to be made."  Praw insinuated that the usual data relied on by Netflix did not justify offering higher pay to Mo'Nique.  In short, to this day, Netflix continues to stand behind and ratify its previous discriminatory offer to Mo'Nique retaliatorily refusing to negotiate fair, equitable and non-discriminatory financial terms with her.

## FIRST CAUSE OF ACTION

### Race Discrimination (Disparate Treatment) in Violation of the Fair

### Employment & Housing Act Against All Defendants

### (Cal. Gov. Code § 12940, *et seq.*)

83.     Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

84.     At all times mentioned herein, the California Fair Employment and Housing Act (FEHA), California Government Code § 12940, *et seq.*, was in full force and effect and binding on Defendants.  Under the FEHA, it is an unlawful employment practice for an employer, because of a person's race/color/ethnicity/ancestry, to bar the person from employment or to discriminate

1   against the person in compensation or in terms, conditions, or privileges of employment.

2        85.    At all times mentioned herein, Defendants were employers within the meaning of

3   the FEHA because they employed five or more persons.

4        86.    At all times mentioned herein, Plaintiff was a prospective employee of Defendants.

5   Defendants scouted Plaintiff for a job, and Plaintiff agreed to apply herself for an employment

6   relationship with Defendants, after which Defendants sent Plaintiff a job offer including the terms

7   of an employment contract.

8        87.    Plaintiff's protected status under the FEHA is her race/ethnicity (African-

9   American), color (Black), and ancestry (African), as well as her gender/sex.

10       88.    Defendants knew, perceived, and/or believed that Plaintiff had the aforementioned

11   protected status, described in the preceding paragraph.

12       89.    At all times mentioned herein, Plaintiff was qualified to do her job and was able to

13   have performed work competently for Defendants.

14       90.    Plaintiff was subjected to an adverse employment action because of her

15   race/ethnicity/color/ancestry. Specifically, Defendants discriminated in the terms and conditions

16   by refusing to pay Plaintiff equitably, comparably and fairly, but instead making a pay offer that

17   was discriminatory based on race/color/ancestry and gender. In short, a Black woman was offered

18   less pay for comparable work than similarly-situated men, caucasions and/or non-Black women.

19       91.    Plaintiff's race/ethnicity/color/ancestry (plus her gender) was/were a substantial

20   motivating reason in Defendants' financial and pay decisions that were adverse to Plaintiff.

21       92.    In engaging in the foregoing conduct, Defendants aided, abetted, incited,

22   participated in, coerced, and/or compelled unlawful employment practices in violation of

23   California's Fair Employment and Housing Act.

24       93.    As a direct and proximate result of Defendants' acts and conduct, Plaintiff has

25   suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will

26   continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to

27   be proven at trial. Plaintiff claims such amount as damages together with pre-judgment interest

28   pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment

1   interest.

2      94.   As a further direct and proximate result of Defendants' acts and conduct, Plaintiff

3   has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and

4   mental distress, loss of enjoyment of life, etc.).

5      95.   The aforementioned acts of Defendants were engaged in with a deliberate, cold,

6   callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a

7   willful and conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute

8   malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  The malicious,

9   fraudulent and/or oppressive conduct was engaged in by, authorized by and/or ratified by

10  corporate officers, directors and/or managing agents.  Therefore, Plaintiff requests an assessment

11  of punitive damages against Defendants in an amount to be assessed at time of trial.

12     96.   Plaintiff will also seek and is entitled to recover attorneys' fees in connection with

13  this cause of action under Government Code section 12940, *et seq.*

14

15                          **SECOND CAUSE OF ACTION**

16         **Race Discrimination (Disparate Impact) in Violation of the Fair**

17            **Employment & Housing Act Against All Defendants**

18                      **(Cal. Gov. Code § 12940, *et seq.*)**

19     97.   Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

20  every preceding paragraph as if fully set forth herein.

21     98.   At all times mentioned herein, the California Fair Employment and Housing Act

22  (FEHA), California Government Code § 12940, *et seq.*, was in full force and effect and binding on

23  Defendants.  Under the FEHA, it is an unlawful employment practice for an employer, because of

24  a person's race/color/ethnicity/ancestry, to bar the person from employment or to discriminate

25  against the person in compensation or in terms, conditions, or privileges of employment.

26     99.   At all times mentioned herein, Defendants were employers within the meaning of

27  the FEHA because they employed five or more persons.

28     100.   At all times mentioned herein, Plaintiff was a prospective employee of Defendants.

1   Defendants scouted Plaintiff for a job, and Plaintiff agreed to apply herself for an employment

2   relationship with Defendants, after which Defendants sent Plaintiff a job offer including the terms

3   of an employment contract.

4         101.   Plaintiff's protected status under the FEHA is her race/ethnicity (African-

5   American), color (Black), and ancestry (African), as well as her gender/sex.

6         102.   Defendants maintained employment practice(s) and/or pay determination polic(ies)

7   and/or practice(s) that had a disproportionate adverse impact or effect on African-American

8   women. Specifically, Defendants' method of calculating compensation to be offered to Black

9   women talent resulted in a disparate impact, which caused lower and unjustified discriminatory

10  offers to be made to Black women compared to caucasions and/or non-Black women. The adverse

11  impact constitutes discrimination in the terms, conditions, or privileges of employment,

12  specifically compensation terms.

13        103.   The subject employment practice(s) and/or pay determination polici(es) and/or

14  practice(s) are not necessary to Defendants' business operations or purposes. Moreover, to the

15  extent that Defendants articulate any alleged necessity for such practices, there were alternative

16  practices and/or policies that would have accomplished the business purpose equally well with less

17  of an adverse impact on Black women.

18        104.   In engaging in the foregoing conduct, Defendants aided, abetted, incited,

19  participated in, coerced, and/or compelled unlawful employment practices in violation of

20  California's Fair Employment and Housing Act.

21        105.   As a direct and proximate result of Defendants' acts and conduct, Plaintiff has

22  suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will

23  continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to

24  be proven at trial. Plaintiff claims such amount as damages together with pre-judgment interest

25  pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment

26  interest.

27        106.   As a further direct and proximate result of Defendants' acts and conduct, Plaintiff

28  has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and

1    mental distress, loss of enjoyment of life, etc.).

2        107.   Plaintiff will also seek and is entitled to recover attorneys' fees in connection with

3    this cause of action under Government Code section 12940, *et seq.*

4

5                              **THIRD CAUSE OF ACTION**

6        **Sex/Gender Discrimination (Disparate Treatment) in Violation of the**

7            **Fair Employment & Housing Act Against All Defendants**

8                        **(Cal. Gov. Code § 12940, *et seq.*)**

9        108.   Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

10   every preceding paragraph as if fully set forth herein.

11       109.   At all times mentioned herein, the California Fair Employment and Housing Act

12   (FEHA), California Government Code § 12940, *et seq.*, was in full force and effect and binding on

13   Defendants.  Under the FEHA, it is an unlawful employment practice for an employer, because of

14   a person's sex/gender, to bar the person from employment or to discriminate against the person in

15   compensation or in terms, conditions, or privileges of employment.

16       110.   At all times mentioned herein, Defendants were employers within the meaning of

17   the FEHA because they employed five or more persons.

18       111.   At all times mentioned herein, Plaintiff was a prospective employee of Defendants.

19   Defendants scouted Plaintiff for a job, and Plaintiff agreed to apply herself for an employment

20   relationship with Defendants, after which Defendants sent Plaintiff a job offer including the terms

21   of an employment contract.

22       112.   Plaintiff's protected status under the FEHA is her sex/gender (female) plus her

23   race/color/ancestry.

24       113.   Defendants knew, perceived, and/or believed that Plaintiff had the aforementioned

25   protected status, described in the preceding paragraph.

26       114.   At all times mentioned herein, Plaintiff was qualified to do her job and was able to

27   have performed work competently for Defendants.

28       115.   Plaintiff was subjected to an adverse employment action because of her sex/gender.

                                    26
                                  COMPLAINT

Specifically, Defendants discriminated in the terms and conditions by refusing to pay Plaintiff equitably, comparably and fairly, but instead making a pay offer that was discriminatory based on sex/gender and/or race/color/ancestry.  In short, a Black woman was offered less pay for comparable work than similarly-situated men, caucasions and/or non-Black women.

116.    Plaintiff's gender (plus her race/ethnicity/color/ancestry) was/were a substantial motivating reason in Defendants' financial and pay decisions that were adverse to Plaintiff.

117.    In engaging in the foregoing conduct, Defendants aided, abetted, incited, participated in, coerced, and/or compelled unlawful employment practices in violation of California's Fair Employment and Housing Act.

118.    As a direct and proximate result of Defendants' acts and conduct, Plaintiff has suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to be proven at trial.  Plaintiff claims such amount as damages together with pre-judgment interest pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment interest.

119.    As a further direct and proximate result of Defendants' acts and conduct, Plaintiff has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and mental distress, loss of enjoyment of life, etc.).

120.    The aforementioned acts of Defendants were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a willful and conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  The malicious, fraudulent and/or oppressive conduct was engaged in by, authorized by and/or ratified by corporate officers, directors and/or managing agents.  Therefore, Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

121.    Plaintiff will also seek and is entitled to recover attorneys' fees in connection with this cause of action under Government Code section 12940, *et seq.*

**FOURTH CAUSE OF ACTION**

**Sex/Gender Discrimination (Disparate Impact) in Violation of**

**the Fair Employment & Housing Act Against All Defendants**

**(Cal. Gov. Code § 12940, *et seq.*)**

122.     Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

123.     At all times mentioned herein, the California Fair Employment and Housing Act (FEHA), California Government Code § 12940, *et seq.*, was in full force and effect and binding on Defendants.  Under the FEHA, it is an unlawful employment practice for an employer, because of a person's sex/gender, to bar the person from employment or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

124.     At all times mentioned herein, Defendants were employers within the meaning of the FEHA because they employed five or more persons.

125.     At all times mentioned herein, Plaintiff was a prospective employee of Defendants. Defendants scouted Plaintiff for a job, and Plaintiff agreed to apply herself for an employment relationship with Defendants, after which Defendants sent Plaintiff a job offer including the terms of an employment contract.

126.     Plaintiff's protected status under the FEHA is her sex/gender (female), plus her race/color/ancestry.

127.     Defendants maintained employment practice(s) and/or pay determination polic(ies) and/or practice(s) that had a disproportionate adverse impact or effect on women (and particularly African-American women).  Specifically, Defendants' method of calculating compensation to be offered to female talent (especially Black females) resulted in a disparate impact, which caused lower and unjustified discriminatory offers to be made to women (especially Black women) compared to men.  The adverse impact constitutes discrimination in the terms, conditions, or privileges of employment, specifically compensation terms.

128.     The subject employment practice(s) and/or pay determination polic(ies) and/or practice(s) are not necessary to Defendants' business operations or purposes.  Moreover, to the

1    extent that Defendants articulate any alleged necessity for such practices, there were alternative
2    practices and/or policies that would have accomplished the business purpose equally well with less
3    of an adverse impact on women and specifically Black women.

4          129.    In engaging in the foregoing conduct, Defendants aided, abetted, incited,
5    participated in, coerced, and/or compelled unlawful employment practices in violation of
6    California's Fair Employment and Housing Act.

7          130.    As a direct and proximate result of Defendants' acts and conduct, Plaintiff has
8    suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will
9    continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to
10   be proven at trial.  Plaintiff claims such amount as damages together with pre-judgment interest
11   pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment
12   interest.

13         131.    As a further direct and proximate result of Defendants' acts and conduct, Plaintiff
14   has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and
15   mental distress, loss of enjoyment of life, etc.).

16         132.    Plaintiff will also seek and is entitled to recover attorneys' fees in connection with
17   this cause of action under Government Code section 12940, *et seq.*

18

19                              **FIFTH CAUSE OF ACTION**
20             **Retaliation in Violation of the Fair Employment & Housing**
21                         **Act Against all Defendants**
22                      **(Cal. Gov. Code § 12940, *et seq.*)**

23         133.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and
24   every preceding paragraph as if fully set forth herein.

25         134.    At all times mentioned herein, the California Fair Employment and Housing Act
26   (FEHA), California Government Code § 12940, *et seq.*, was in full force and effect and binding on
27   Defendants.

28         135.    During her application process for employment by Defendants, Plaintiff opposed

1   and objected to what she reasonably believed was unlawful conduct – specifically, a

2   discriminatory pay offer as detailed above and the subsequent refusal to negotiate.

3        136.   After Plaintiff voiced her complaints and objections, or sought protections of

4   and/or to exercise her rights under the Fair Employment and Housing Act, she was subjected to

5   additional adverse employment actions as described above, including the retaliatory refusal to

6   fairly and equitably negotiate her pay.

7        137.   The foregoing described adverse employment actions were taken in part or in

8   whole because of Plaintiff's objections and opposition to Defendants' efforts to discourage

9   Plaintiff from pursuing her rights under the Fair Employment and Housing Act.

10       138.   In engaging in the foregoing conduct, Defendants aided, abetted, incited,

11  participated in, coerced, and/or compelled unlawful employment practices in violation of

12  California's Fair Employment and Housing Act.

13       139.   As a direct and proximate result of Defendants' acts and conduct, Plaintiff has

14  suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will

15  continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to

16  be proven at trial. Plaintiff claims such amount as damages together with pre-judgment interest

17  pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment

18  interest.

19       140.   As a further direct and proximate result of Defendants' acts and conduct, Plaintiff

20  has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and

21  mental distress, loss of enjoyment of life, etc.).

22       141.   The aforementioned acts of Defendants were engaged in with a deliberate, cold,

23  callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a

24  willful and conscious disregard of Plaintiff's rights. Such acts were despicable and constitute

25  malice, fraud, and/or oppression within the meaning of Civil Code section 3294. The malicious,

26  fraudulent and/or oppressive conduct was engaged in by, authorized by and/or ratified by

27  corporate officers, directors and/or managing agents. Therefore, Plaintiff requests an assessment

28  of punitive damages against Defendants in an amount to be assessed at time of trial.

142.   Plaintiff will also seek and is entitled to recover attorneys' fees in connection with this cause of action under Government Code section 12940, *et seq.*

## SIXTH CAUSE OF ACTION

### Failure to Prevent Discrimination and Retaliation in Violation of the Fair

### Employment & Housing Act Against All Defendants

### (Cal. Gov. Code § 12940, *et seq.*)

143.   Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

144.   Defendants failed to take all reasonable steps necessary to prevent discrimination and retaliation in employment from occurring.  Further, Defendants knew or should have known of the discrimination and retaliation against Plaintiff described above, yet failed to conduct an adequate investigation into the nature and substance of the discrimination/retaliation and failed to take immediate and appropriate corrective action so as to discipline any of the offenders.

145.   The response of Defendants, and/or their agents/employees, to that knowledge was so inadequate as to establish a deliberate indifference to, or tacit authorization of, the alleged offensive practices, and an affirmative causal link existed between Defendants' inaction and the injuries suffered by Plaintiff.

146.   By failing to take all reasonable steps necessary to prevent discrimination and retaliation, and by failing to properly investigate and remedy the discrimination and retaliation that occurred, Defendants committed unlawful employment practices as described and prohibited in Government Code section 12940(k).

147.   As a direct and proximate result of Defendants' acts and conduct, Plaintiff has suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to be proven at trial.  Plaintiff claims such amount as damages together with pre-judgment interest pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment interest.

148.    As a further direct and proximate result of Defendants' acts and conduct, Plaintiff has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and mental distress, loss of enjoyment of life, etc.).

149.    The aforementioned acts of Defendants were engaged in with a deliberate, cold, callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a willful and conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  The malicious, fraudulent and/or oppressive conduct was engaged in by, authorized by and/or ratified by corporate officers, directors and/or managing agents.  Therefore, Plaintiff requests an assessment of punitive damages against Defendants in an amount to be assessed at time of trial.

150.    Plaintiff will also seek and is entitled to recover attorneys' fees in connection with this cause of action under Government Code section 12940, *et seq.*

## SEVENTH CAUSE OF ACTION

### Discrimination Based on Race/Color/Ethnicity/Ancestry

### Against All Defendants

### (42 U.S.C. § 1981)

151.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and every preceding paragraph as if fully set forth herein.

152.    Plaintiff is a member of a protected group based on her race (African-American), color (Black), ethnicity (non-White, non-Hispanic or Latino), and/or ancestry (African).

153.    Under 42 U.S.C. section 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. § 1981(a).

154.    As detailed herein, Defendants, through their agents and employees, discriminated against Plaintiff in the making and enforcing of a contract, denying her full and equal benefit of all laws enjoyed by white citizens.  Specifically, Defendants engaged in pay discrimination against

1    Plaintiff as detailed herein.

2         155.   Plaintiff was subjected to an adverse employment action because of her

3    race/color/ethnicity/ancestry – specifically, Defendants refused to pay Plaintiff equitably,

4    comparably and fairly, but instead made a pay offer that was discriminatory.  In short, a Black

5    woman was offered less pay for comparable work than similarly-situated non-Black women.

6         156.   Plaintiffs' race, color, ethnicity, and/or ancestry was/were a motivating factor and

7    indeed even a substantial or determining factor in the discriminatory conduct and practices and

8    disparate treatment described herein and above.

9         157.   At all relevant times, Defendants had actual and constructive knowledge of the

10   discriminatory conduct described and alleged herein above, and condoned, ratified, participated in

11   and/or allowed the discrimination to exist all at least in reckless disregard of Plaintiff's federally-

12   protected rights.

13        158.   As a direct and proximate result of Defendants' acts and conduct, Plaintiff has

14   suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will

15   continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to

16   be proven at trial.  Plaintiff claims such amount as damages together with pre-judgment interest

17   pursuant to any provision of law providing for pre-judgment interest.

18        159.   As a further direct and proximate result of Defendants' acts and conduct, Plaintiff

19   has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and

20   mental distress, loss of enjoyment of life, etc.).

21        160.   Defendants committed the acts herein alleged with malice and/or reckless

22   indifference to Plaintiff's federally-protected rights such that punitive damages are proper to

23   punish and/or make an example of Defendants.  The corporate employer Defendants are liable for

24   punitive damages because a management official of said Defendant personally acted with malice

25   or reckless indifference to Plaintiff's federally-protected rights and/or because and/or because such

26   individuals authorized, ratified or engaged in such conduct.  Thus, Plaintiff is entitled to punitive

27   damages from Defendants in an amount according to proof.

28        161.   Plaintiff will also seek and is entitled to recover attorneys' fees in connection with

1  this cause of action under 42 U.S.C. section 1988.

2

3                      **EIGHTH CAUSE OF ACTION**

4                      **Retaliation Against All Defendants**

5                         **(42 U.S.C. § 1981)**

6          162.   Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

7   every preceding paragraph as if fully set forth herein.

8          163.   Under 42 U.S.C. section 1981, "[a]ll persons within the jurisdiction of the United

9   States shall have the same right in every State and Territory to make and enforce contracts, to sue,

10  be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the

11  security of persons and property as is enjoyed by white citizens...." 42 U.S.C. §1981(a).

12         164.   Plaintiff is African-American who engaged in legally-protected activity by

13  opposing and raising concerns or making reports about Defendants' discriminatory pay offer as

14  detailed herein.

15         165.   After Plaintiff voiced her complaints and objections to the discriminatory

16  treatment, she was subjected to additional adverse employment actions as described above,

17  including the retaliatory refusal to fairly and equitably negotiate her pay.  Plaintiff's protected

18  conduct was/were a motivating factor and indeed even a substantial or determining factor in the

19  retaliatory conduct and practices described herein and above.  Defendants' adverse action(s) are

20  causally connected to Plaintiff's protected activity/activities.

21         166.   At all relevant times, Defendants had actual and constructive knowledge of the

22  retaliatory conduct described and alleged herein above, and condoned, ratified, participated in

23  and/or allowed the retaliatory conduct to exist all at least in reckless disregard of Plaintiff's

24  federally-protected rights.

25         167.   As a direct and proximate result of Defendants' acts and conduct, Plaintiff has

26  suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will

27  continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to

28  be proven at trial.  Plaintiff claims such amount as damages together with pre-judgment interest

1   pursuant to any provision of law providing for pre-judgment interest.

2      168.   As a further direct and proximate result of Defendants' acts and conduct, Plaintiff

3   has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and

4   mental distress, loss of enjoyment of life, etc.).

5      169.   Defendants committed the acts herein alleged with malice and/or reckless

6   indifference to Plaintiff's federally-protected rights such that punitive damages are proper to

7   punish and/or make an example of Defendants.  The corporate employer Defendants are liable for

8   punitive damages because a management official of said Defendant personally acted with malice

9   or reckless indifference to Plaintiff's federally-protected rights.  Thus, Plaintiff is entitled to

10  punitive damages from Defendants in an amount according to proof.

11     170.   Plaintiff will also seek and is entitled to recover attorneys' fees in connection with

12  this cause of action under 42 U.S.C. section 1988.

13

14                          **NINTH CAUSE OF ACTION**

15            **Discrimination in Violation of the Unruh Civil Rights**

16                      **Act Against All Defendants**

17                          **(Cal. Civ. Code §51)**

18     171.   Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

19  every preceding paragraph as if fully set forth herein.

20     172.   The Unruh Civil Rights Act, found in California Civil Code section 51, provides in

21  part that: "All persons within the jurisdiction of this state are free and equal, and no matter what

22  their sex, race, color, ancestry, national origin … are entitled to the full and equal

23  accommodations, advantages, facilities, privileges, or services in all business establishments of

24  every kind whatsoever."

25     173.   Defendants are business establishments for purposes of the Unruh Civil Rights Act.

26  As part of the operation of their business, Defendants provide facilities, privileges, services, etc. to

27  permit the streaming of online content.

28     174.   As alleged herein, Plaintiff contends she was made an offer of "employment"

1  within the meaning of the California Fair Employment & Housing Act.  However, to the extent
2  that it is determined that the offer was not one of "employment" within the meaning of the
3  California Fair Employment & Housing Act, then alternatively Plaintiff alleges that she was
4  seeking to avail herself of the provision of facilities, privileges, services, etc. supplied by
5  Defendants in order to stream online comedy content.

6      175.    As alleged herein, Defendants intentionally discriminated against Plaintiff – a
7  Black woman – by offering her financial terms that were discriminatory – *i.e.*, less money for
8  substantially similar services compared to non-Black women.  By doing so, Defendants denied
9  Plaintiff equal access to and provision of facilities, privileges, services, etc. to stream online
10  content.

11      176.    As a direct and proximate result of Defendants' acts and conduct, Plaintiff has
12  suffered economic losses (the denial of fair and equitable non-discriminatory pay) and will
13  continue to suffer damages in an amount within the jurisdiction of this court, the exact amount to
14  be proven at trial.  Plaintiff claims such amount as damages together with pre-judgment interest
15  pursuant to Civil Code section 3287 and/or any other provision of law providing for pre-judgment
16  interest.

17      177.    As a further direct and proximate result of Defendants' acts and conduct, Plaintiff
18  has been caused to, and did, suffer and continues to suffer general damages (*e.g.*, emotional and
19  mental distress, loss of enjoyment of life, etc.).

20      178.    Defendants' violation(s) of the Unruh Civil Rights Act entitles Plaintiff to recover
21  statutory damages of a maximum of three times the amount of actual damages or a minimum of
22  four thousand dollars ($4,000.00) pursuant to California Civil Code section 52(a).

23      179.    The aforementioned acts of Defendants were engaged in with a deliberate, cold,
24  callous, fraudulent, and intentional manner in order to injure and damage Plaintiff and/or with a
25  willful and conscious disregard of Plaintiff's rights.  Such acts were despicable and constitute
26  malice, fraud, and/or oppression within the meaning of Civil Code section 3294.  The malicious,
27  fraudulent and/or oppressive conduct was engaged in by, authorized by and/or ratified by
28  corporate officers, directors and/or managing agents.  Therefore, Plaintiff requests an assessment

1    of punitive damages against Defendants in an amount to be assessed at time of trial.

2       180.    Plaintiff will also seek and is entitled to recover attorneys' fees in connection with

3    this cause of action under Civil Code section 52(a).

4

5                       **TENTH CAUSE OF ACTION**

6       **Unlawful and Unfair Business Practices Against All Defendants**

7            **(Cal. Bus. & Prof. Code § 17200, *et seq.*)**

8       181.    Plaintiff hereby re-alleges and incorporates by reference all allegations in each and

9    every preceding paragraph as if fully set forth herein.

10       182.    As detailed herein, Netflix maintains unlawful policies and/or practices of paying

11    Black women less than non-Black women for performing substantially equal or similar work.

12    Netflix maintains a business practice of doing so because Netflix's acts and omissions as alleged

13    herein have been done repeatedly over a significant period of time, and in a systematic manner, to

14    the detriment of Plaintiff.

15       183.    Netflix's acts and omissions, as alleged herein, violate California and federal law

16    relating to discrimination and pay equity, and they violate the spirit of the California Equal Pay

17    Act, as amended, Labor Code § 1197.5, and therefore constitute unlawful business practices

18    prohibited by Business & Professions Code § 17200, *et seq.*

19       184.    Netflix's business practice of paying Black women less than non-Black women for

20    substantially equal or similar work causes harm to Plaintiff that outweighs any reason Netflix may

21    have for doing so.

22       185.    Netflix's business practice as alleged herein is also immoral, unethical, oppressive,

23    unscrupulous, and offensive to the established public policies of ensuring women and men are

24    paid equally for performing substantially equal or similar work, as reflected in numerous statutes

25    including the California Equal Pay Act (Labor Code § 1197.5), the federal Equal Pay Act (29

26    U.S.C. § 206(d)), the California Fair Employment and Housing Act (Government Code § 12940,

27    *et seq.*,), Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq.*), and Section 1981

28    (42 U.S.C. §1981).

186.    As a result of its unlawful and/or unfair business practices, Netflix has reaped and continues to reap unfair and illegal profits at the expense of Plaintiff.  Accordingly, Netflix should be disgorged of its illegal profits, and Plaintiff is entitled to restitution with interest of such ill-gotten profits, in an amount according to proof at the time of trial.  Plaintiff is also entitled to restitution for that which was denied to her as a result of the foregoing unlawful practices.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1.    For general and special damages according to proof (except on the 10th cause of action);

2.    For loss of earnings and earning capacity, according to proof;

3.    For punitive and/or exemplary damages in an amount to punish Defendants to the extent allowed by law (except on the 10th cause of action);

4.    For attorneys' fees in prosecuting this action to the extent allowed by law (except on the 10th cause of action);

5.    For pre-judgment interest to the extent allowed by law;

6.    For post-judgment interest to the extent allowed by law;

7.    For costs of suit incurred herein;

8.    For declaratory relief;

9.    For injunctive relief (including but not limited to stopping the unlawful practices alleged herein); and

10.    For such other and further relief as the Court deems just and proper.

DATED: November 14, 2019

Schimmel & Parks, APLC            The deRubertis Law Firm, APC

By:                                By:
    Michael W. Parks                   David M. deRubertis
    Attorneys for Plaintiff            Attorneys for Plaintiff
    Monique Hicks                      Monique Hicks

COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands trial by jury on all issues so triable in the Complaint, or any other

3   pleading filed in this matter.

4

5   DATED: November 14, 2019

6          Schimmel & Parks, APLC          The deRubertis Law Firm, APC

7

8   By:                                     By:

9          Michael W. Parks                      David M. deRubertis
           Attorneys for Plaintiff              Attorneys for Plaintiff
10         Monique Hicks                         Monique Hicks

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Electronically FILED by Superior Court of California, County of Los Angeles on 11/18/2019 08:19 AM Sherri R. Carter, Executive Officer/Clerk of Court, by C. Bibiano, Deputy Clerk

Case 2:19-cv-10452-AB-AFM Document 1-4 Filed 12/10/19 Page 43 of 76 Page ID #:49

19STCV40934

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| David M. deRubertis (SBN 208709)<br>**The deRubertis Law Firm, APC**<br>4219 Coldwater Canyon Avenue, Studio City, California 91604<br>TELEPHONE NO.: (818) 761-2322 FAX NO.: (818) 761-2323<br>ATTORNEY FOR (Name): Plaintiff Monique Hicks | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS: 111 N. Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
Hicks v. Netflix, Inc., et al.

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | CASE NUMBER: |
|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment** [Permissive filing in Central District per Local Rule 2.3(a)(1)(B)]
- [X] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive
4. Number of causes of action *(specify):* Ten (10)
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: November 14, 2019

David M. deRubertis (SBN 208709)
(TYPE OR PRINT NAME)                                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov<br>Westlaw Doc & Form Builder™ |
|---|---|---|

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
  Auto (22)–Personal Injury/Property
    Damage/Wrongful Death
  Uninsured Motorist (46) *(if the*
    *case involves an uninsured*
    *motorist claim subject to*
    *arbitration, check this item*
    *instead of Auto)*
**Other PI/PD/WD (Personal Injury/**
**Property Damage/Wrongful Death)**
**Tort**
  Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/
      Wrongful Death
  Product Liability *(not asbestos or*
    *toxic/environmental)* (24)
  Medical Malpractice (45)
    Medical Malpractice–
      Physicians & Surgeons
    Other Professional Health Care
      Malpractice
  Other PI/PD/WD (23)
    Premises Liability (e.g., slip
      and fall)
    Intentional Bodily Injury/PD/WD
      (e.g., assault, vandalism)
    Intentional Infliction of
      Emotional Distress
    Negligent Infliction of
      Emotional Distress
    Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
  Business Tort/Unfair Business
    Practice (07)
  Civil Rights (e.g., discrimination,
    false arrest) *(not civil*
    *harassment)* (08)
  Defamation (e.g., slander, libel)
    (13)
  Fraud (16)
  Intellectual Property (19)
  Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice
      *(not medical or legal)*
  Other Non-PI/PD/WD Tort (35)
**Employment**
  Wrongful Termination (36)
  Other Employment (15)

**Contract**
  Breach of Contract/Warranty (06)
    Breach of Rental/Lease
      Contract *(not unlawful detainer*
      *or wrongful eviction)*
    Contract/Warranty Breach–Seller
      Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/
      Warranty
    Other Breach of Contract/Warranty
  Collections (e.g., money owed, open
    book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections
      Case
  Insurance Coverage *(not provisionally*
    *complex)* (18)
    Auto Subrogation
    Other Coverage
  Other Contract (37)
    Contractual Fraud
    Other Contract Dispute
**Real Property**
  Eminent Domain/Inverse
    Condemnation (14)
  Wrongful Eviction (33)
  Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent*
      *domain, landlord/tenant, or*
      *foreclosure)*
**Unlawful Detainer**
  Commercial (31)
  Residential (32)
  Drugs (38) *(if the case involves illegal*
    *drugs, check this item; otherwise,*
    *report as Commercial or Residential)*
**Judicial Review**
  Asset Forfeiture (05)
  Petition Re: Arbitration Award (11)
  Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court
      Case Matter
    Writ–Other Limited Court Case
      Review
  Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor
      Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal.**
**Rules of Court Rules 3.400–3.403)**
  Antitrust/Trade Regulation (03)
  Construction Defect (10)
  Claims Involving Mass Tort (40)
  Securities Litigation (28)
  Environmental/Toxic Tort (30)
  Insurance Coverage Claims
    *(arising from provisionally complex*
    *case type listed above)* (41)
**Enforcement of Judgment**
  Enforcement of Judgment (20)
    Abstract of Judgment (Out of
      County)
    Confession of Judgment *(non-*
      *domestic relations)*
    Sister State Judgment
    Administrative Agency Award
      *(not unpaid taxes)*
    Petition/Certification of Entry of
      Judgment on Unpaid Taxes
    Other Enforcement of Judgment
      Case
**Miscellaneous Civil Complaint**
  RICO (27)
  Other Complaint *(not specified*
    *above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-*
      *harassment)*
    Mechanics Lien
    Other Commercial Complaint
      Case *(non-tort/non-complex)*
    Other Civil Complaint
      *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
  Partnership and Corporate
    Governance (21)
  Other Petition *(not specified*
    *above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult
      Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late
      Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

| SHORT TITLE: Hicks v. Netflix, Inc., et al. | CASE NUMBER |
|---|---|

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.

2. Permissive filing in central district.

3. Location where cause of action arose.

4. Mandatory personal injury filing in North District.

5. Location where performance required or defendant resides.

6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.

8. Location wherein defendant/respondent functions wholly.

9. Location where one or more of the parties reside.

10. Location of Labor Commissioner Office.

11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons See Step 3 Above |
|---|---|---|
| **Auto Tort** | | |
| Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/Wrongful Death Tort** | | |
| Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

Local Rule 2.3
Page 1 of 4

| SHORT TITLE: Hicks v. Netflix, Inc., et al. | CASE NUMBER |
|---|---|

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | | |
| Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | | |
| Wrongful Termination (36) | ☑ A6037  Wrongful Termination | 1, 2, 3 |
| Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | | |
| Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | | |
| Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | ☐ A6032  Quiet Title | 2, 6 |
| | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | | |
| Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

**CIVIL CASE COVER SHEET ADDENDUM**
**AND STATEMENT OF LOCATION**

| SHORT TITLE: Hicks v. Netflix, Inc., et al. | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151 Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152 Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153 Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150 Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003 Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141 Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160 Abstract of Judgment | 2, 6 |
| | | ☐ A6107 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114 Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011 Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113 Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121 Civil Harassment With Damages | 2, 3, 9 |
| | | ☐ A6123 Workplace Harassment With Damages | 2, 3, 9 |
| | | ☐ A6124 Elder/Dependent Adult Abuse Case With Damages | 2, 3, 9 |
| | | ☐ A6190 Election Contest | 2 |
| | | ☐ A6110 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

| SHORT TITLE: Hicks v. Netflix, Inc., et al. | CASE NUMBER |
|---|---|

**Step 4:** **Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON:<br><br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7.  ☐ 8. ☐ 9. ☐ 10. ☐ 11. | ADDRESS:<br>[Permissive filing in Central District per Local Rule 2.3(a)(1)(B)]<br>5808 Sunset Blvd. |
|---|---|
| **CITY:**<br>Los Angeles | **STATE:** CA | **ZIP CODE:** 90028 | |

**Step 5:** **Certification of Assignment:** I certify that this case is properly filed in the _____Central_____ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: November 14, 2019

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LASC CIV 109 Rev. 12/18
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**11/14/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ Marita P. Barel _____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>19STCV40934 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✓ | Holly J. Fujie | 56 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record     Sherri R. Carter, Executive Officer / Clerk of Court

on 11/14/2019                                By Marita P. Barel                    , Deputy Clerk
   (Date)

LACIV 190 (Rev 6/18)          **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

LACIV 190 (Rev 6/18)    **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**
LASC Approved 05/06

# VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**



**California Employment
Lawyers Association**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties. The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application. These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆**Los Angeles County Bar Association Litigation Section**◆

◆ **Los Angeles County Bar Association Labor and Employment Law Section**◆

◆**Consumer Attorneys Association of Los Angeles**◆

◆**Southern California Defense Counsel**◆

◆**Association of Business Trial Lawyers**◆

◆**California Employment Lawyers Association**◆

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|

TELEPHONE NO.:
E-MAIL ADDRESS (Optional):          FAX NO. (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.

The parties agree that:

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

   a. The party requesting the Informal Discovery Conference will:

      i.   File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

      ii.  Include a brief summary of the dispute and specify the relief requested; and

      iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

   b. Any Answer to a Request for Informal Discovery Conference must:

      i.   Also be filed on the approved form (copy attached);

      ii.  Include a brief summary of why the requested relief should be denied;

LACIV 036 (new)
LASC Approved 04/11          **STIPULATION – DISCOVERY RESOLUTION**
For Optional Use                                                              Page 1 of 3

| SHORT TITLE | | CASE NUMBER |
|---|---|---|
| | | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

    It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding (or demanding or requesting) party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

## The following parties stipulate:

Date:

_____    >    _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR PLAINTIFF)

Date:

_____    >    _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____    >    _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____    >    _____
(TYPE OR PRINT NAME)                          (ATTORNEY FOR DEFENDANT)

Date:

_____    >    (ATTORNEY FOR _____)
(TYPE OR PRINT NAME)

Date:

_____    >    (ATTORNEY FOR _____)
(TYPE OR PRINT NAME)

Date:

_____    >    (ATTORNEY FOR _____)
(TYPE OR PRINT NAME)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| | | |

TELEPHONE NO.:                          FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1. The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

   a. Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

   b. Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

   c. Exchange of names and contact information of witnesses;

   d. Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

   e. Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

   f. Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

   g. Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

discussed in the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

   h.  Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

   i.  Whether the case is suitable for the Expedited Jury Trial procedures (see information at **www.lacourt.org** under "*Civil*" and then under "*General Information*").

2.  The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the  complaint, and _____ for the cross-
                    (INSERT DATE)                            (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at **www.lacourt.org** under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3.  The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date: _____

_____      > _____
       (TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)

Date: _____

_____      > _____
       (TYPE OR PRINT NAME)                           (ATTORNEY FOR DEFENDANT)

Date: _____

_____      > _____
       (TYPE OR PRINT NAME)                           (ATTORNEY FOR DEFENDANT)

Date: _____

_____      > _____
       (TYPE OR PRINT NAME)                           (ATTORNEY FOR DEFENDANT)

Date: _____

_____      > _____
       (TYPE OR PRINT NAME)                           (ATTORNEY FOR _____)

Date: _____

_____      > _____
       (TYPE OR PRINT NAME)                           (ATTORNEY FOR _____)

                                           > _____
       (TYPE OR PRINT NAME)                           (ATTORNEY FOR _____)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:  FAX NO. (Optional):<br>E-MAIL ADDRESS (Optional):<br>ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   - ☐ Request for Informal Discovery Conference
   - ☐ Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (Insert date 10 calendar days following filing of the Request)

3. Deadline for Court to hold Informal Discovery Conference: _____ (Insert date 20 calendar days following filing of the Request).

4. For a Request for Informal Discovery Conference, **briefly** describe the nature of the discovery dispute, including the facts and legal arguments at issue. For an Answer to Request for Informal Discovery Conference, **briefly** describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| | | |
| TELEPHONE NO.:          FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE | CASE NUMBER |
|---|---|
|  |  |

**The following parties stipulate:**

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR PLAINTIFF)

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR DEFENDANT)

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR DEFENDANT)

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR DEFENDANT)

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR _____)

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR _____)

Date:

_____          _____
(TYPE OR PRINT NAME)                                 (ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date:   _____          _____
                                                              JUDICIAL OFFICER



# Superior Court of California, County of Los Angeles

## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS must serve this ADR Information Package on any new parties named to the action with the cross-complaint.**

### What is ADR?
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control with the parties:** Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

    **Mediation may be appropriate when the parties**
    - want to work out a solution but need help from a neutral person.
    - have communication problems or strong emotions that interfere with resolution.

    **Mediation may not be appropriate when the parties**
    - want a public trial and want a judge or jury to decide the outcome.
    - lack equal bargaining power or have a history of physical/emotional abuse.

**How to arrange mediation in Los Angeles County**

Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online):

   - JAMS, Inc.: Case Manager (213) 253-9776 mdawson@jamsadr.com
   - Mediation Center of Los Angeles: Case Manager: (833) 476-9145 info@mediationLA.org

   These organizations cannot accept every case and they may decline cases at their discretion.
   Visit www.lacourt.org/ADR.Res.List for important information and FAQs before contacting them.
   NOTE: This service is not available for family law, probate or small claims.

b. **Los Angeles County Dispute Resolution Programs**
   (https://wdacs.lacounty.gov/programs/drp/
   - Free, day of, trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
   - Free or low-cost mediations before the day of trial for these and other case types.
   - For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit
     http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

---

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: www.lacourt.org/division/civil/settlement

**Los Angeles Superior Court ADR website:** www.lacourt.org/division/civil/settlement
**For general information and videos about ADR, visit** http://www.courts.ca.gov/programs-adr.htm

2019-GEN-014-00

**FILED**
Superior Court of California
County of Los Angeles

**MAY 03 2019**

Sherri R. Carter, Executive Officer/Clerk
By _____, Deputy
Rizalinda Mina

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

IN RE LOS ANGELES SUPERIOR COURT )    FIRST AMENDED GENERAL ORDER
— MANDATORY ELECTRONIC FILING )
FOR CIVIL )
)
)
)
)

On December 3, 2018, the Los Angeles County Superior Court mandated electronic filing of all documents in Limited Civil cases by litigants represented by attorneys. On January 2, 2019, the Los Angeles County Superior Court mandated electronic filing of all documents filed in Non-Complex Unlimited Civil cases by litigants represented by attorneys. (California Rules of Court, rule 2.253(b).) All electronically filed documents in Limited and Non-Complex Unlimited cases are subject to the following:

1) DEFINITIONS

   a) **"Bookmark"**  A bookmark is a PDF document navigational tool that allows the reader to quickly locate and navigate to a designated point of interest within a document.

   b) **"Efiling Portal"**  The official court website includes a webpage, referred to as the efiling portal, that gives litigants access to the approved Electronic Filing Service Providers.

   c) **"Electronic Envelope"**  A transaction through the electronic service provider for submission of documents to the Court for processing which may contain one or more PDF documents attached.

   d) **"Electronic Filing"**  Electronic Filing (eFiling) is the electronic transmission to a Court of a document in electronic form. (California Rules of Court, rule 2.250(b)(7).)

1

2019-GEN-014-00

e) **"Electronic Filing Service Provider"**   An Electronic Filing Service Provider (EFSP) is a person or entity that receives an electronic filing from a party for retransmission to the Court. In the submission of filings, the EFSP does so on behalf of the electronic filer and not as an agent of the Court.  (California Rules of Court, rule 2.250(b)(8).)

f) **"Electronic Signature"**   For purposes of these local rules and in conformity with Code of Civil Procedure section 17, subdivision (b)(3), section 34, and section 1010.6, subdivision (b)(2), Government Code section 68150, subdivision (g), and California Rules of Court, rule 2.257, the term "Electronic Signature" is generally defined as an electronic sound, symbol, or process attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the electronic record.

g) **"Hyperlink"**   An electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or different document.

h) **"Portable Document Format"**   A digital document format that preserves all fonts, formatting, colors and graphics of the original source document, regardless of the application platform used.

2) MANDATORY ELECTRONIC FILING

a) Trial Court Records

Pursuant to Government Code section 68150, trial court records may be created, maintained, and preserved in electronic format.  Any document that the Court receives electronically must be clerically processed and must satisfy all legal filing requirements in order to be filed as an official court record (California Rules of Court, rules 2.100, et seq. and 2.253(b)(6)).

b) Represented Litigants

Pursuant to California Rules of Court, rule 2.253(b), represented litigants are required to electronically file documents with the Court through an approved EFSP.

c) Public Notice

The Court has issued a Public Notice with effective dates the Court required parties to electronically file documents through one or more approved EFSPs.  Public Notices containing effective dates and the list of EFSPs are available on the Court's website, at www.lacourt.org.

2019-GEN-014-00

d) Documents in Related Cases

Documents in related cases must be electronically filed in the eFiling portal for that case type if electronic filing has been implemented in that case type, regardless of whether the case has been related to a Civil case.

3) **EXEMPT LITIGANTS**

a) Pursuant to California Rules of Court, rule 2.253(b)(2), self-represented litigants are exempt from mandatory electronic filing requirements.

b) Pursuant to Code of Civil Procedure section 1010.6, subdivision (d)(3) and California Rules of Court, rule 2.253(b)(4), any party may make application to the Court requesting to be excused from filing documents electronically and be permitted to file documents by conventional means if the party shows undue hardship or significant prejudice.

4) **EXEMPT FILINGS**

a) The following documents shall not be filed electronically:

   i) Peremptory Challenges or Challenges for Cause of a Judicial Officer pursuant to Code of Civil Procedure sections 170.6 or 170.3;

   ii) Bonds/Undertaking documents;

   iii) Trial and Evidentiary Hearing Exhibits

   iv) Any ex parte application that is filed concurrently with a new complaint including those that will be handled by a Writs and Receivers department in the Mosk courthouse; and

   v) Documents submitted conditionally under seal. The actual motion or application shall be electronically filed. A courtesy copy of the electronically filed motion or application to submit documents conditionally under seal must be provided with the documents submitted conditionally under seal.

b) Lodgments

Documents attached to a Notice of Lodgment shall be lodged and/or served conventionally in paper form. The actual document entitled, "Notice of Lodgment," shall be filed electronically.

//

//

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

5) ELECTRONIC FILING SYSTEM WORKING PROCEDURES

Electronic filing service providers must obtain and manage registration information for persons and entities electronically filing with the court.

6) TECHNICAL REQUIREMENTS

a) Electronic documents must be electronically filed in PDF, text searchable format when technologically feasible without impairment of the document's image.

b) The table of contents for any filing must be bookmarked.

c) Electronic documents, including but not limited to, declarations, proofs of service, and exhibits, must be bookmarked within the document pursuant to California Rules of Court, rule 3.1110(f)(4).  Electronic bookmarks must include links to the first page of each bookmarked item (e.g. exhibits, declarations, deposition excerpts) and with bookmark titles that identify the bookedmarked item and briefly describe the item.

d) Attachments to primary documents must be bookmarked.  Examples include, but are not limited to, the following:

   i)   Depositions;

   ii)  Declarations;

   iii) Exhibits (including exhibits to declarations);

   iv)  Transcripts (including excerpts within transcripts);

   v)   Points and Authorities;

   vi)  Citations; and

   vii) Supporting Briefs.

e) Use of hyperlinks within documents (including attachments and exhibits) is strongly encouraged.

f) Accompanying Documents

   Each document acompanying a single pleading must be electronically filed as a **separate** digital PDF document.

g) Multiple Documents

   Multiple documents relating to one case can be uploaded in one envelope transaction.

4

FIRST AMENDED GENERAL ORDER RE MANDATORY ELECTRONIC FILING FOR CIVIL

2019-GEN-014-00

h) Writs and Abstracts

Writs and Abstracts must be submitted as a separate electronic envelope.

i) Sealed Documents

If and when a judicial officer orders documents to be filed under seal, those documents must be filed electronically (unless exempted under paragraph 4); the burden of accurately designating the documents as sealed at the time of electronic submission is the submitting party's responsibility.

j) Redaction

Pursuant to California Rules of Court, rule 1.201, it is the submitting party's responsibility to redact confidential information (such as using initials for names of minors, using the last four digits of a social security number, and using the year for date of birth) so that the information shall not be publicly displayed.

7) ELECTRONIC FILING SCHEDULE

a) Filed Date

i) Any document received electronically by the court between 12:00 am and 11:59:59 pm shall be deemed to have been effectively filed on that court day if accepted for filing. Any document received electronically on a non-court day, is deemed to have been effectively filed on the next court day if accepted.   (California Rules of Court, rule 2.253(b)(6); Code Civ. Proc. § 1010.6(b)(3).)

ii) Notwithstanding any other provision of this order, if a digital document is not filed in due course because of: (1) an interruption in service; (2) a transmission error that is not the fault of the transmitter; or (3) a processing failure that occurs after receipt, the Court may order, either on its own motion or by noticed motion submitted with a declaration for Court consideration, that the document be deemed filed and/or that the document's filing date conform to the attempted transmission date.

8) EX PARTE APPLICATIONS

a) Ex parte applications and all documents in support thereof must be electronically filed no later than 10:00 a.m. the court day before the ex parte hearing.

5

2019-GEN-014-00

b) Any written opposition to an ex parte application must be electronically filed by 8:30 a.m. the day of the ex parte hearing. A printed courtesy copy of any opposition to an ex parte application must be provided to the court the day of the ex parte hearing.

9) PRINTED COURTESY COPIES

a) For any filing electronically filed two or fewer days before the hearing, a courtesy copy must be delivered to the courtroom by 4:30 p.m. the same business day the document is efiled. If the efiling is submitted after 4:30 p.m., the courtesy copy must be delivered to the courtroom by 10:00 a.m. the next business day.

b) Regardless of the time of electronic filing, a printed courtesy copy (along with proof of electronic submission) is required for the following documents:

    i)    Any printed document required pursuant to a Standing or General Order;

    ii)    Pleadings and motions (including attachments such as declarations and exhibits) of 26 pages or more;

    iii)    Pleadings and motions that include points and authorities;

    iv)    Demurrers;

    v)    Anti-SLAPP filings, pursuant to Code of Civil Procedure section 425.16;

    vi)    Motions for Summary Judgment/Adjudication; and

    vii)    Motions to Compel Further Discovery.

c) Nothing in this General Order precludes a Judicial Officer from requesting a courtesy copy of additional documents. Courtroom specific courtesy copy guidelines can be found at www.lacourt.org on the Civil webpage under "Courtroom Information."

10) WAIVER OF FEES AND COSTS FOR ELECTRONICALLY FILED DOCUMENTS

a) Fees and costs associated with electronic filing must be waived for any litigant who has received a fee waiver. (California Rules of Court, rules 2.253(b)(), 2.258(b), Code Civ. Proc. § 1010.6(d)(2).)

b) Fee waiver applications for waiver of court fees and costs pursuant to Code of Civil Procedure section 1010.6, subdivision (b)(6), and California Rules of Court, rule 2.252(f), may be electronically filed in any authorized action or proceeding.

2019-GEN-014-00

11) SIGNATURES ON ELECTRONIC FILING

For purposes of this General Order, all electronic filings must be in compliance with California Rules of Court, rule 2.257. This General Order applies to documents filed within the Civil Division of the Los Angeles County Superior Court.

This First Amended General Order supersedes any previous order related to electronic filing, and is effective immediately, and is to remain in effect until otherwise ordered by the Civil Supervising Judge and/or Presiding Judge.

DATED: May 3, 2019        KEVIN C. BRAZILE
Presiding Judge

7

Electronically FILED by Superior Court of California, County of Los Angeles on 11/15/2019 10:41 AM Sherri R. Carter, Executive Officer/Clerk of Court, by A. Miro, Deputy Clerk

1   David M. deRubertis, State Bar No. 208709
    Garen R. Nadir, State Bar No. 285394
2   **The deRubertis Law Firm, APC**
3   4219 Coldwater Canyon Avenue
    Studio City, California 91604
4   Telephone:     (818) 761-2322
    Facsimile:     (818) 761-2323
5   E-Mail: David@deRubertisLaw.com
    E-Mail: Garen@deRubertisLaw.com
6
7   Alan I. Schimmel, State Bar No. 101328
    Michael W. Parks, State Bar No. 154531
8   Arya Rhodes, State Bar No. 299390
    **Schimmel & Parks, APLC**
9   15303 Ventura Blvd., Suite 650
    Sherman Oaks, California 91403
10  Telephone:     (818) 464-5061
    Facsimile:     (818) 464-5091
11  E-Mail: MWParks@spattorneys.com
12
    Attorneys for Plaintiff
13  Monique Hicks

14              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15        **IN AND FOR THE COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

16

17  MONIQUE HICKS, an individual,          Case No.: 19STCV40934
                                           *[Assigned for all purposes to the Hon. Holly J.*
18        Plaintiff,                       *Fujie; Dept. 56]*

19        vs.

20  NETFLIX, INC., a Delaware corporation; and
21  DOES 1 through 50, inclusive,          **NOTICE OF POSTING JURY FEES**

22        Defendants.

23                                         Complaint filed:        November 14, 2019

24

25

26

27

28

**TO ALL PARTIES HEREIN AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE Plaintiff Monique Hicks hereby deposits one hundred and fifty dollars ($150.00) in compliance with Code of Civil Procedure § 631.

DATED: November 15, 2019          **The deRubertis Law Firm, APC**

                                  **Schimmel & Parks, APLC**


                         By:  _____
                                  David M. deRubertis
                                  Attorneys for Plaintiff
                                  Monique Hicks

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

| | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**11/15/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By:  Brenda Chavez  Deputy |
| PLAINTIFF:<br>Monique Hicks | |
| DEFENDANT:<br>NETFLIX, INC., a Delaware corporation | |
| **NOTICE OF CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br>19STCV40934 |

## TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date:<br>03/16/2020 | Time:<br>8:30 AM | Dept.:<br>56 |
|---|---|---|

**NOTICE TO DEFENDANT:** THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated:  11/15/2019

Holly J. Fujie / Judge
Judicial Officer

---

## CERTIFICATE OF SERVICE

I, the below named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in  Los Angeles , California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

David M. deRubertis
4219 Coldwater Canyon Avenue

Studio City, CA 91604

Sherri R. Carter, Executive Officer / Clerk of Court

Dated:  11/15/2019

By  Brenda Chavez
Deputy Clerk

LACIV 132 (Rev. 07/13)
LASC Approved 10-03
For Optional Use

**NOTICE OF
CASE MANAGEMENT CONFERENCE**

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter Three

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**11/15/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____ Brenda Chavez _____ Deputy |
| PLAINTIFF/PETITIONER:<br>Monique Hicks | |
| DEFENDANT/RESPONDENT:<br>NETFLIX, INC., a Delaware corporation | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>19STCV40934 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.

David M. deRubertis
The deRubertis Law Firm, APC
4219 Coldwater Canyon Avenue
Studio City, CA  91604

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/15/2019

By: Brenda Chavez
Deputy Clerk

**CERTIFICATE OF MAILING**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

CENTRAL DISTRICT-STANLEY MOSK COURTHOUSE
CIVIL DIVISION
111 NORTH HILL STREET
LOS ANGELES, CALIFORNIA 90012    *Dept. 56*



U.S. POSTAGE >> PITNEY BOWES

ZIP 90012    $ 000.50⁰
02 4W
0000336112 NOV 18 2019

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

**11/15/2019**

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ Brenda Chavez _____ Deputy

COURTHOUSE ADDRESS:

Stanley Mosk Courthouse

111 North Hill Street, Los Angeles, CA 90012

PLAINTIFF(S):

Monique Hicks

DEFENDANT(S):

NETFLIX, INC., a Delaware corporation

**ORDER TO SHOW CAUSE HEARING**

CASE NUMBER:

19STCV40934

To the party / attorney of record:

You are ordered to appear for an Order to Show Cause Hearing on 03/16/2020 at 8:30 AM in department 56 of this court, Stanley Mosk Courthouse and show cause why sanctions should not be imposed for:

[✓]   Failure to file proof of service.

Failure to comply or appear may result in sanctions pursuant to one or more of the following: California Rules of Court, rule 2.30 and rule 3.1340; Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.310, 583.360, 583.410, 583.420, 583.430; and Government Code section 68608.

[✓]   To avoid a mandatory appearance all required documents must be filed at least 5 days prior to the date of the hearing.

**Holly J. Fujie**

Dated:  11/15/2019 _____

_____
Holly J. Fujie / Judge
Judicial Officer

**ORDER TO SHOW CAUSE HEARING**

LACIV 166 (Rev. 09/08)
LASC Approved 06-04

Cal. Rules of Court, rule 2.30
LASC Local Rules, Chapter 7

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**11/15/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____Brenda Chavez_____ Deputy |
| PLAINTIFF/PETITIONER:<br>Monique Hicks | |
| DEFENDANT/RESPONDENT:<br>NETFLIX, INC., a Delaware corporation | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>19STCV40934 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Order to Show Cause Failure to File Proof of Service upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

David M. deRubertis
The deRubertis Law Firm, APC
4219 Coldwater Canyon Avenue
Studio City, CA  91604

Sherri R. Carter, Executive Officer / Clerk of Court

Dated: 11/15/2019

By:  Brenda Chavez
      Deputy Clerk

**CERTIFICATE OF MAILING**

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES**

CENTRAL DISTRICT-STANLEY MOSK COURTHOUSE
CIVIL DIVISION
111 NORTH HILL STREET
LOS ANGELES, CALIFORNIA 90012    *Dept. 56*



U.S. POSTAGE ⟫ PITNEY BOWES

ZIP 90012
02 4W        **$ 000.50⁰**
0000336112 NOV 18 2019

9160431934 C039