UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | CV 19-10452-AB (MAAx) | Date: | July 15, 2020 |
|---|---|---|---|

| Title: | Monique Hicks v. Netflix, Inc., et al. |
|---|---|

| Present: The Honorable | ANDRÉ BIROTTE JR., United States District Judge |
|---|---|

| Carla Badirian | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Appearing | None Appearing |

**Proceedings:**     [In Chambers] Order Denying Defendant's Second Motion to Dismiss Plaintiff's First Amended Complaint (Dkt. No. 37)

Before the Court is Defendant Netflix, Inc.'s ("Defendant" or "Netflix") Second Motion to Dismiss three retaliation-based claims from the First Amended Complaint ("FAC") filed by Monique Hicks ("Plaintiff" or "Mo'Nique"). ("MTD," Dkt. No. 37). Plaintiff filed an Opposition thereto, ("Opp'n," Dkt. No. 44), and Defendant filed a Reply, ("Reply," Dkt. No. 45).

For the reasons below, Defendant's Motion is **DENIED**.

//
//
//

I. **BACKGROUND**

  A. **Factual Background**

Plaintiff Monique Hicks (professionally known as "Mo'Nique") brings the instant lawsuit alleging that, because of her race and gender, Netflix discriminated against her by offering her less money to perform a one-hour comedy special than it offered other comedians. Mo'Nique further alleges that, after she objected to her "discriminatory low-ball offer," which Netflix later confirmed was an "opening offer," Netflix retaliated against her when it "dug its heels in the ground" and refused to negotiate fair pay with her. (First Amended Complaint ("FAC"), Dkt. No. 33 at ¶¶ 4, 62). The following factual allegations are taken from the FAC.

  i. **Netflix's emergence as a dominating force in the stand-up comedy industry**

Netflix is a world-leading Internet-based entertainment services provider. (FAC ¶ 37). Netflix's primary business is its subscription-based streaming service, with more than 158 million paid subscribers in over 190 countries. (*Id.*). The service offers its members online streaming of film and television programs, including original content that Netflix produces in-house. (*Id.*). As part of its original content creation, Netflix commissions comedians to produce and star in stand-up comedy specials and has emerged "as a dominating force that is disrupting the [stand-up comedy] industry." (*Id.* ¶ 40).

  ii. **Mo'Nique's background as the "Queen of Comedy"**

Mo'Nique is an Oscar-winning actress who has led a successful career as both a stand-up comic and actress. (*Id.* ¶¶ 46–47). She has also won awards from the Screen Actors Guild, Sundance Film Festival, BET, and NAACP, among many others. (*Id.* ¶¶ 48–49). While climbing the Hollywood ranks, performing in a variety of genres, and hosting shows, Mo'Nique never strayed too far from her comedic roots. (*Id.* ¶¶ 50–55). One of her most notable performances to date is when she starred in the hit stand-up comedy film, *The Queens of Comedy*, which follows four Black female stand-up comedians at Memphis, Tennessee's Orpheum Theatre. (*Id.* ¶ 50).

//
//
//

### iii. **Netflix's allegedly discriminatory "opening offer" to Mo'Nique**

In late 2017, after Netflix executives attended one of Mo'Nique's live stand-up shows, they began to recruit her for a Netflix original stand-up program. (*Id.* ¶¶ 57–58). Following a series of conversations between Mo'Nique and her representatives and Netflix's representatives, on January 11, 2018, Netflix extended an offer to Mo'Nique to produce and perform in a one-hour comedy special, for which she would be paid a $500,000 "talent fee." (*Id.* ¶ 60). Mo'Nique claims that this pay proposal was discriminatory based on her race and gender, especially in light of multi-million dollar offers Netflix has made to other comedic talent, namely Jerry Seinfeld, Eddie Murphy, Dave Chapelle ("Chapelle"), Chris Rock ("Rock"), Ellen DeGeneres, Jeff Dunham, Ricky Gervais, and Amy Schumer ("Schumer"). (*Id.* ¶¶ 67–68). Overall, she alleges that Netflix made offers to other comedic talent to perform in similar stand-up shows, but, when the talent was not a Black woman, Netflix paid astronomically more than it did to Black women like her. (*Id.* ¶ 67).

### iv. **Netflix's alleged retaliation against Mo'Nique for challenging her offer as discriminatory**

After receiving her offer, Mo'Nique alleges that, both personally and through her representatives, she objected to its terms, calling out Netflix for discriminating against Black women. (*Id.* ¶ 70). Initially, Mo'Nique's representatives wrote to Netflix's executives, pleading that they reconsider the "racially and gender biased offer" and questioning "what makes Mo'Nique, who has been labeled a living legend based on her awards from around the world . . . worth $12,500,000 less than Amy Schumer to [Netflix]?" (*Id.* ¶ 71). Mo'Nique's representatives pointed out that her Black male counterparts were paid seven million dollars more per show than Schumer to emphasize that it made no sense for Mo'Nique to be offered only $500,000 for similar work. Mo'Nique maintains that this email "responded to the 'opening offer' by counter-offering with alternative amounts" of pay received by other comedians. (*Id.*). Netflix responded that it took "very seriously" the concerns raised in the email and agreed to set up a call. (*Id.* ¶ 72).

On January 17, 2018, Mo'Nique's representatives had a call with, among others, Robbie Praw ("Praw"), Netflix's Director of Original Stand-up Comedy Programming. (*Id.* ¶ 73). During this call, Mo'Nique's representatives again asked how Netflix had arrived at its pay valuation for Mo'Nique compared to others,

reiterating that she viewed her offer as discriminatory based on her race/color and gender. (*Id.*). In explaining why the offer was so low in their view, Mo'Nique's representatives reviewed some of Mo'Nique's body of work and her history of success, to which Netflix responded that it does not look at "résumés" or "bodies of work to arrive at pay offers, but rather uses an "assumptive approach." (*Id*).

On the call, Praw allegedly justified paying Schumer (a White woman) twenty-six times more than Mo'Nique for the same one-hour comedy special on grounds that Schumer had sold out Madison Square Garden and had a recent movie released. (*Id*). Mo'Nique's representatives replied that Netflix was citing Schumer's "résumé" or "body of work" to justify Schumer's pay, but refused to look at Mo'Nique's to make her a fair pay offer. (*Id.*). Purportedly pressed repeatedly, Praw stated that based on its "internal data" Netflix uses an "assumptive approach" or "anticipatory approach" and "had a process and that's the way we do it" in determining compensation. (*Id.*). Based on this, Mo'Nique maintains that Netflix "steadfastly refus[ed] to negotiate reasonable terms or reconsider the lowball, discriminatory offer." (*Id.*). She further asserts that, in "refus[ing] to engage in any negotiation" and "present[ing] its offer on 'take it or leave it' terms[,]" Netflix "departed from its regular practice of negotiating in good faith including by offering more favorable compensation terms through negotiation." (*Id.* ¶ 75).

### (1) **Netflix's alleged standard negotiation process after extending opening offers**

Mo'Nique alleges that when it comes to the type of offer Netflix made to her, "Netflix has a regular, customary and standard practice of negotiating in good faith that typically results in increased monetary compensation beyond the 'opening offer.'" (*Id.* ¶ 62). As Mo'Nique explains, Netflix typically begins the negotiation with an "opening offer" (including "opening" monetary terms), but under the company's regular practice, this initial offer is not the expected end result of the negotiation. (*Id.*). Rather, Netflix presents its "opening offer" with an expectation—held by both Netflix and the recipient of the offer—that the negotiation will lead to increased monetary terms. (*Id.* ¶¶ 63–64). And Netflix confirmed, after Mo'Nique filed this lawsuit, that its offer to Mo'Nique was merely its "opening offer." (*Id.* ¶ 63).

Mo'Nique provides that this practice of a negotiated end point is standard in the industry and standard specifically within Netflix, and that this was known to her when she was in negotiations with Netflix. (*Id.* ¶ 62). She alleges that, by

confirming that its offer to her was just its "opening offer," and not its "take-it-or-leave-it final offer," Netflix itself has implicitly acknowledged that there was a likelihood of increased compensation to her, had the negotiation process continued through Netflix's standard process. (*Id.* ¶ 63). Specifically, Mo'Nique alleges that "once [she] engaged in protected conduct by protesting the discriminatory offer, Netflix shut down any further negotiations and refused to negotiate in good-faith consistent with its standard practices, thereby denying [her] equal terms, conditions, privileges, and benefits of employment." (*Id.* ¶ 64). Had Netflix not shut down continued negotiations, Mo'Nique alleges that "Netflix would have made [her] increased offer(s) that would have led to substantial and material increases in the monetary compensation" she was offered. (*Id.* ¶ 65).

### (2) **Netflix's alleged continuation of negotiations with other non-Black talent that led to increased offers**

Mo'Nique alleges that, "in other similar situations involving men and Caucasians, Netflix has negotiated increased offers." (*Id.* ¶ 75). She specifically alleges that Schumer leveraged the fact that Netflix offered significantly higher compensation to Chapelle and Rock to increase her offer to $13,000,000.00, an increase of more than fifteen percent of her original offer. (*Id.* ¶ 67).

### v. **Mo'Nique went public about her offer and allegedly discovered another Black female comedian was given a "low-ball" offer**

At some time after the January 17, 2018 call with Netflix's representatives, Mo'Nique spoke out publicly about her purportedly discriminatory offer and called for a boycott of Netflix, asserting a discriminatory pay gap. (*Id.* ¶ 76).

After she went public, Netflix allegedly extended an offer for a similar comedy special to Wanda Sykes ("Sykes") (also a Black woman), who at first publicly rejected Netflix's offer as "low-ball" and stated that she was "offended" by it and, as a result, "found another home" for her comedy specials. (*Id.* ¶ 79). According to Mo'Nique, after her call for a boycott, Netflix subsequently "reconsidered and eventually offered Sykes a better and more equitable deal." (*Id.*). In Sykes' words, "[t]hey moved that comma." (*Id.*). Mo'Nique alleges that Netflix refused to do the same for her as retaliation for being "the most vocal, outspoken critic of Netflix's pay inequity practices." (*Id.* ¶ 80).

//

### b. Procedural Background

Mo'Nique filed her initial Complaint in Los Angeles Superior Court on November 22, 2019. (Dkt. No. 1-1). Netflix removed the action to this Court on December 10, 2019. (Dkt. No. 1).

Mo'Nique's FAC asserts the following 10 claims: (1) Race Discrimination (Disparate Treatment) in Violation of the Fair Employment and Housing Act (Cal. Gov. Code § 12940, *et seq.*) ("FEHA"); (2) Race Discrimination (Disparate Impact) in Violation of FEHA; (3) Sex/Gender Discrimination (Disparate Treatment) in Violation of FEHA; (4) Sex/Gender Discrimination (Disparate Impact) in Violation of FEHA; (5) Retaliation in Violation of FEHA; (6) Failure to Prevent Discrimination and Retaliation in Violation of FEHA; (7) Discrimination Based on Race/Ethnicity/ Color/Ancestry (42 U.S.C. § 1981); (8) Retaliation (42 U.S.C. § 1981); (9) Discrimination in Violation of the Unruh Civil Rights Act (Cal. Civ. Code § 51); and (10) Unfair Business Practices (Cal. Bus. & Prof. Code § 17200, *et seq.*). (FAC).

### i. Netflix's First Motion to Dismiss

On January 13, 2020 Netflix filed its first motion to dismiss Mo'Nique's retaliation-based claims. (Dkt. No. 14). On March 19, 2020, the Court granted Netflix's first motion to dismiss, finding that Mo'Nique failed to allege that any adverse employment action occurred after she engaged in protected activity to make out a retaliation claim under FEHA or Section 1981. The Court explained that it:

> does not see how Defendant's purported failure to continue negotiations with Plaintiff affected any change to the terms and conditions of her employment, let alone a *substantial* change. Plaintiff alleges that Defendant gave her a $500,000 offer *before* she complained about that offer being discriminatory and 'low-ball.' And Plaintiff alleges that, even after complaining, she continued to have that offer, purportedly left on 'take-it-or-leave-it' terms. Accordingly, Plaintiff alleges no change in, or affect to, the terms of her offer after her protected activity, and thus, no adverse action.

(March 19, 2020 Order, Dkt. No. 32 at 11–12) (citations to Complaint omitted) (emphasis in original). However, the Court noted that "Plaintiff raises a novel theory here, namely that failure to negotiate constitutes an 'adverse employment

action' for purposes of a retaliation claim" and granted leave to amend in light of arguments raised orally before the Court. Here, the Court finds that Mo'Nique's FAC cures the defects previously identified and adequately asserts a plausible retaliation claim.

## II. LEGAL STANDARD

### a. Rule 12(b)(6) Motion to Dismiss

Federal Rule of Civil Procedure ("Rule") 8 requires a plaintiff to present a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a defendant may move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

To defeat a Rule 12(b)(6) motion to dismiss, the complaint must provide enough factual detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While detailed factual allegations are not required, the complaint must be "plausible on its face," that is, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Labels, conclusions, and "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

A court may dismiss a complaint under Rule 12(b)(6) based on the lack of a cognizable legal theory, or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When ruling on a Rule 12(b)(6) motion, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The court must make all reasonable inferences in the plaintiff's favor. *Nordstrom v. Ryan*, 762 F.3d 903, 906 (9th Cir. 2014). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

"[A] plaintiff is not required to plead a prima facie case of discrimination or retaliation in order to survive a motion to dismiss." *Cloud v. Brennan*, No. 19-cv-04638-TSH, ⸺ F.Supp.3d. ⸺, 2020 WL 533003, at *6 (N.D. Cal. Feb. 3, 2020) (citing *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012); *Lacayo v. Donahoe*, No. 14–cv–04077–JSC, 2015 WL 3866070, at *12 (N.D. Cal. June 22, 2015)). "When a plaintiff does not plead a prima facie case, courts still look to the elements of the prima facie case 'to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'" *Id.* (citing *Achal v. Gate Gourmet, Inc.*, 114 F.Supp.3d 781, 796–97 (N.D. Cal. 2015)).

### III. DISCUSSION

#### a. Netflix's Motion to Dismiss Retaliation-Based Claims: <u>Fifth Claim</u> (Retaliation in Violation of FEHA); <u>Part of the Sixth Claim</u> (Failure to Prevent Retaliation in Violation of FEHA) and <u>Eighth Claim</u> (Retaliation in Violation of 42 U.S.C. § 1981)

Netflix moves to dismiss all of Mo'Nique's retaliation-based claims, specifically her Fifth Claim asserting retaliation under FEHA, the portion of the Sixth Claim asserting failure to prevent retaliation under FEHA,[1] and the Eighth Claim asserting retaliation under 42 U.S.C. § 1981. The Court begins its analysis of Mo'Nique's retaliation-based claims with the legal standards governing them.

#### i. General Legal Principles

##### (1) California Government Code § 12940(a), or FEHA

Mo'Nique's Fifth Claim and portion of the Sixth Claim rest on Section 12940(a) of the California Government Code (or FEHA) which provides that "[i]t is an unlawful employment practice," except in situations not applicable here, "[f]or an employer, because of the race, . . . color, . . . , or sex of any person, to refuse to hire or employ the person . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Cal. Gov't Code § 12940(a).

---

[1] Defendant only seeks dismissal of the portion of Plaintiff's Sixth Claim to the extent that it alleges that Defendant failed to prevent *retaliation*, not *discrimination*.

### a. **Retaliation under FEHA**

California's FEHA makes it unlawful for an employer to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." Cal. Gov't Code § 12940(h). To assert a prima facie claim for retaliation under FEHA, Plaintiff must plead that: (1) she engaged in "protected activity," (2) the employer subjected her to an "adverse employment action," and (3) there is a "causal link" between the protected activity and the employer's action. *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1042 (2005); *see also Doe v. Dep't of Corr. & Rehab.*, 43 Cal.App.5th 721, 734 (2019); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). FEHA's governing regulations regarding retaliation provide that:

> It is unlawful for an employer . . . to . . . fail to hire or consider for hire, fail to give equal consideration in making employment decisions, . . . adversely affect working conditions or otherwise deny any employment benefit to an individual because that individual has opposed practices prohibited by the Act[.]

2 Cal. Code. Regs. § 11021(a).

### b. **Failure to Prevent Retaliation under FEHA**

Mo'Nique's Sixth Claim asserts that Netflix failed to prevent retaliation under FEHA. California Government Code section 12940(k) makes it an unlawful employment practice for an employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k). California state courts have observed that this provision creates a statutory tort action with the usual tort elements (duty of care to the plaintiff, breach of duty, causation, and damages). *See Ellis v. U.S. Sec. Assocs.*, 224 Cal.App.4th 1213, 1228 (2014); *Veronese v. Lucasfilm Ltd.*, 212 Cal.App.4th 1, 28 (2012). Federal courts have established elements for the claim: (1) that the plaintiff was subjected to discrimination, harassment, or *retaliation*; (2) that the defendant failed to take all reasonable steps to prevent discrimination, harassment, or *retaliation*; and (3) that this failure caused the plaintiff to suffer injury, damage, loss, or harm. *See Aparicio v. Comcast, Inc.*, 274 F.Supp.3d 1014, 1030 (N.D. Cal. 2017); *Pinder v. Employment Dev. Dep't*, 227 F.Supp.3d 1123, 1141 (E.D. Cal. 2017).

Insofar as it is the first element recognized in the federal court decisions, and that breach of duty and causation are required under the state court decisions, this claim fails if the Court ultimately concludes that there was no actionable workplace discrimination. *See Trujillo v. N. Cty. Transit Dist.*, 63 Cal.App.4th 280, 288–89 (1998); *Pinder*, 227 F.Supp.3d at 1151. Further, to the extent that Mo'Nique's Sixth Claim arises from Netflix's alleged failure to prevent retaliation, that claim fails if Mo'Nique cannot plead sufficient facts to show that she was subjected to retaliation in the first instance. *Trujillo*, 63 Cal.App.4th at 289 (holding that underlying "retaliation" is a prima facie element of a claim for alleged failure to prevent that retaliation). Netflix's challenge to Mo'Nique's claim for failure to prevent retaliation is derivative of, and dependent on, its attack on her FEHA retaliation claim, so the two challenges rise and fall together.

### (2) **Retaliation under 42 U.S.C. § 1981 ("Section 1981")**

Section 1981 encompasses employment-related retaliation claims. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452–57 (2008); *Johnson v. Lucent Techs., Inc.*, 653 F.3d 1000, 1006 (9th Cir. 2011). Section 1981 states, in relevant part, that:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, [and] penalties . . . , and to no other.

42 U.S.C. § 1981(a). The rights protected by Section 1981 "are protected against impairment by nongovernmental discrimination and impairment under color of State law." *Id.* § 1981(c). Employment discrimination claims under Section 1981 are guided by the Title VII analysis which, like Mo'Nique's FEHA-based discrimination claims, are governed by the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Weil v. Citizens Telecom Servs. Co.*, LLC, 922 F.3d 993, 1002 (9th Cir. 2019); *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1103 (9th Cir. 2008); *Manatt v. Bank of Am., NA*, 339 F.3d 792, 797 (9th Cir. 2003).

As with Mo'Nique's FEHA retaliation claim, her Eighth Claim for retaliation under Section 1981 must allege facts that she engaged in an activity protected by statute, and that she suffered an adverse employment action because

she engaged in that activity. *See Brown v. Contra Costa County*, No. C 12–1923 PJH, 2014 WL 1347680, at *6 (N.D. Cal. Apr. 3, 2014) (dismissing Section 1981 retaliation claim because plaintiff alleged no facts showing that the alleged adverse action "was in retaliation for [plaintiff's] exercise of a contractual right protected under § 1981."). The analysis of retaliation claims under FEHA is largely the same as the analysis required for evaluation of her Section 1981 claims. *See Sims v City & County of San Francisco*, No. 14–cv–00576–SI, 2015 WL 1351143, at *5 (N.D. Cal. Mar. 25, 2015).

### ii. The Parties' Arguments Regarding Mo'Nique's Retaliation Claims[2]

#### a. Netflix's Arguments

Netflix argues that Mo'Nique's retaliation claims fail as a matter of law because she alleges no conduct by Netflix constituting an "adverse employment action" that occurred *after* she complained about her initial offer,[3] and thus, has failed to allege any causal link between her protected activity and some "adverse employment action." Specifically, Netflix maintains that its alleged (1) failure to negotiate in good faith and (2) denial of compensation (by failing to increase Mo'Nique's "opening offer") do not constitute "adverse employment actions" under the California Supreme Court's decision in *Yanowitz*, which requires that an adverse employment action "materially affect the terms, conditions, or privileges of employment[.]" *Yanowitz*, 36 Cal.4th at 1052. Here, Netflix claims that no terms were materially affected because its original $500,000 offer remained on the table, even after Mo'Nique engaged in protected activity by complaining about that offer. (MTD at 6–7).

---

[2] For the purpose of this motion only, Defendant assumes, without conceding that Plaintiff was an employee or prospective employee entitled to FEHA's protections. (MTD at 6, n.1). The Court also understands that, for the purpose of this motion only, Defendant assumes that Mo'Nique's act of complaining about her offer to Netflix and publicly calling for a boycott of Netflix are "protected activities," as Netflix stated in its first motion to dismiss. (Dkt. No. 14 at 4, n.3). Nowhere in Netflix's briefing does it argue that Mo'Nique's speech did not constitute protected activity.

[3] "By definition, 'retaliation' occurs only *after* the applicant has complained about not getting the job or *after* she has begun to participate" in a protected activity. *Sada v. Robert F. Kennedy Med. Ctr.*, 56 Cal.App.4th 138, 161 (1997), *as modified on denial of reh'g* (July 1, 1997) (emphasis added).

First, Netflix asserts that there is no legal authority supporting Mo'Nique's proposition that an employer's failure to negotiate in good faith, consistent with its purported customary practice, is an "adverse employment action," rendering this theory legally untenable. (MTD at 11). Netflix further explains that a "negotiation" is not a term, condition, benefit, or privilege of employment, but rather, a "process by which parties may reach an agreement on terms (whether for employment or otherwise)." (*Id.*). As such, the company maintains that an adverse employment action cannot lie simply because Mo'Nique did not achieve her desired outcome from her representatives' discussion with Netflix's representatives on January 17, 2018.

Second, Netflix asserts that Mo'Nique's "dashed expectations of an increased offer" (MTD at 9), or her claim that she was entitled to an increase of her "opening offer" under Netflix's alleged customary practice is "illogical" and not grounds for a retaliation claim. (MTD at 13). As a preliminary matter, Netflix argues that Mo'Nique made a mere suggestion, not a counteroffer, when she compared her offer to that of other comedians when seeking an increase (MTD at 13), but the company later concedes that Mo'Nique "refuse[d] to make a *reasonable* counteroffer, thus requiring [Netflix] to negotiate against itself." (Reply at 7). Regardless, even if Mo'Nique were deemed to have made a counter-offer, Netflix claims that she can only speculate as to the result of any continued negotiations. (MTD at 13). Netflix asserts that such speculation cannot, as a matter of law, give rise to an adverse employment action, and in any event, the company had no affirmative obligation to increase its offer to Mo'Nique. (*Id.*).

### b. **Mo'Nique's Arguments**

Mo'Nique counters that she sets forth a plausible theory of retaliation to survive the instant motion to dismiss at this early pleading stage. She argues that, after she objected to Netflix's allegedly discriminatory, "low-ball" offer to her, Netflix retaliated against her by failing to negotiate in good faith, contrary to its standard negotiation practice which typically leads to increased compensation above the "opening offer." (Opp'n at 1; FAC ¶¶ 62, 137). Specifically, Mo'Nique argues that her FAC plausibly alleges adverse employment action because it asserts that Netflix's failure to negotiate with her had a direct, substantial, material, and detrimental effect on her compensation, especially in light of Netflix's public confirmation that her offer was merely an "opening offer" and thus was likely to increase. (Opp'n at 1, 9, 11; FAC ¶¶ 63–64, 138). Accordingly, Mo'Nique claims that she plausibly alleges that Netflix offered her less money than it otherwise would have offered her had she not spoken out against the offer. (Opp'n at 14).

Overall, Mo'Nique maintains that she has plausibly alleged that, because she challenged her "opening offer," Netflix retaliated by converting that initial offer to "a take-it-or-leave-it final offer," thereby denying her the same practice or employment benefit "of continued good-faith negotiation" and increased compensation that it often extends to those who do not engage in legally protected activity like she did. (Opp'n at 1; FAC ¶ 64).

### iii. The Court's Determination Regarding Mo'Nique's Retaliation Claims

Here, the parties do not dispute that Mo'Nique has adequately pled that she engaged in protected activity by expressly challenging Netflix's opening offer as discriminatory on the basis of race and gender. The parties do, however, dispute whether Mo'Nique has (1) plausibly alleged that Netflix subjected her to an "adverse employment action," and (2) that there is a "causal link" between her protected activity and Netflix's conduct. *Yanowitz*, 36 Cal.4th at 1042. The Court addresses each in turn.

#### (1) Mo'Nique adequately pleads retaliation claims under FEHA and Section 1981

##### a. Mo'Nique plausibly alleges an adverse employment action

###### i. Case law on adverse employment actions in the retaliation context

Here, Netflix argues that Mo'Nique has failed to allege an "adverse employment action," and thus, her retaliation-based claims fail as a matter of law.

To plead a retaliation claim, Mo'Nique must allege an "adverse employment action." *Yanowitz*, 36 Cal.4th at 1042 (FEHA retaliation); *Brown*, 2014 WL 1347680 at *6 (Section 1981 retaliation). "Retaliation must result in a substantial adverse change in the terms and conditions of the plaintiff's employment." *Akers v. County of San Diego*, 95 Cal.App.4th 1441, 1455 (2002).

"California defines adverse employment actions as those 'materially affect[ing] the terms, conditions, or privileges of employment.'" *Flores v. City of Westminster,* 873 F.3d 739, 748 (9th Cir. 2017) (quoting *Yanowitz*, 36 Cal. 4th at

1052).[4] "[T]he phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." *Yanowitz*, 36 Cal. 4th at 1054; *see also Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) ("We define 'adverse employment action' broadly."). FEHA's regulations expressly define an "employment benefit" as including "any benefit of employment covered by the Act, including hiring, employment, . . . compensation . . . and any other favorable term, condition or privilege of employment." 2 Cal. Code Regs. § 11008(h). The regulations also define an "[e]mployment practice" as "[a]ny act, omission, policy or decision of an employer . . . affecting any of an individual's employment benefits or consideration for employment benefits." 2 Cal. Code. Regs. § 110089(g).

"Actions that are '*reasonably likely* to impair a reasonable employee's job performance or prospects for advancement or promotion fall[ ] within the reach of [FEHA's retaliation provisions]." *Flores*, 873 F.3d at 749 (quoting *Yanowitz*, 36 Cal.4th at 1054–55) (emphasis added). Such actions are not limited "only to so-called 'ultimate employment actions' such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." *Yanowitz*, 36 Cal.4th at 1054; *see also Light v. California Dep't of Parks & Recreation*, 14 Cal.App.5th 75, 91–92 (2017). As the California Supreme Court has explained:

> [r]etaliation claims are inherently fact specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into

---

[4] The Court may separately analyze whether an adverse employment action has occurred under the "materiality" test set forth in *Yanowitz*, for Mo'Nique's FEHA retaliation claim, and the "deterrence" test set forth in *Burlington Northern and Santa Fe Ry. Co v. White*, 548 U.S. 53, 66–67 (2006), for her Section 1981 claim. However, here the Court finds that both of Mo'Nique's state and federal retaliation claims survive under the more stringent "materiality" test, and accordingly analyzes both claims under the *Yanowitz* framework.

  account the unique circumstances of the affected employee as well as
  the workplace context of the claim.

*Yanowitz*, 36 Cal.4th at 1052. Further, "alleged acts of retaliation may be considered collectively to determine whether, taken together, they constitute an adverse employment action under the statute." *Flores*, 873 F.3d at 749 (citing *Id.* at 1055, 1060).

"[A]n adverse employment action exists where an employer's action *negatively affects* its employee's compensation." *Fonsecas v. Sysco Food Servs. of Arizona, Inc.*, 374 F.3d 840, 847 (9th Cir. 2004) (emphasis added); *see also Gillis v. Georgia Dep't of Corrections*, 400 F.3d 883 (11th Cir. 2005) ("[A]ctions that affect compensation are considered adverse employment actions."); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("The denial of a pay raise clearly affects [a plaintiff's] compensation, and . . . [is an] adverse employment action[]." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)). Even so, under the "materiality" test, FEHA's employment protections are "not limited to adverse employment actions that impose an economic detriment or inflict a tangible psychological injury upon an employee." *Yanowitz*, 36 Cal. 4th at 1052. Thus, the "materiality" test does not require tangible, present economic harm, and plausible allegations that an adverse employment action negatively impacted compensation can satisfy this test.

       ii. **Application to Mo'Nique's case**

In asserting her Fifth, Sixth (in part), and Eighth Claims for retaliation, Mo'Nique alleges that after she engaged in protected activity by "voic[ing] her complaints and objections" about her allegedly discriminatory pay offer directly to Netflix, the company subjected her to "adverse employment actions . . . including the retaliatory refusal to fairly and equitably negotiate her pay." (FAC ¶¶ 136, 164). Mo'Nique specifically alleges two adverse actions, which the Court considers together as they inform each other: (1) the denial of Netflix's regular practice of good faith negotiation (had she not spoken out, Netflix would not have shut down the negotiation and would have increased her pay), and (2) the denial of increased compensation (had she not spoken out, Netflix would have offered her substantially more than her "opening offer" of $500,000). (*Id.* ¶ 137).

Mo'Nique's FAC alleges that *before* she engaged in protected activity, Netflix gave her a $500,000 "opening offer" (FAC ¶ 60) and that Netflix intended—through its standard process of good-faith negotiation—to increase this

offer, as it typically does in such negotiations. (*Id.* ¶¶ 62–65, 71, 75). But *after* she spoke up and protested the "opening offer" as discriminatory (*Id.* ¶¶ 69–73, 76), Netflix retaliatorily shut down negotiations, and converted her "opening offer" to a "take-it-or-leave-it final offer." (*Id.* ¶¶ 62–65, 71–73, 75, 77, 80, 137, 167). Further, when pointing out that Schumer (a White female comedian) objected to her offer (given how much lower it was than that of comparable males), Netflix reconsidered and upped her offer. (*Id.* ¶ 4). Based on these allegations, Mo'Nique asserts that Netflix's negotiation shutdown and denial of increased compensation in response to her protected activity effected a "substantial adverse change in the terms and conditions" of her employment. *Akers*, 95 Cal.App.4th at 1455.

Here, the factual allegations set forth in Mo'Nique's FAC, viewed in the light most favorable to her at this early stage of the litigation, plausibly allege an adverse employment action sufficient to survive a motion to dismiss. *See White v. Wilsack*, 888 F.Supp.2d 92, 98–99 (D.D.C. 2012) ("At this early stage of the case, the court must rely on the allegations in the complaint. With that in mind, the court determines that the denial of a detail position *could possibly have affected Plaintiff's potential pay*, thereby causing a 'direct, measurable, and immediate' effect on Plaintiff's compensation, a term of her employment.") (emphasis added). Mo'Nique plausibly alleges that, after she spoke out and called her initial offer discriminatory, Netflix retaliated against her by shutting down its "standard practice of negotiating in good faith that typically results in increased monetary compensation beyond the 'opening offer'" and denying her increased compensation as a result. (FAC ¶ 65). *See Derby v. City of Pittsburg*, No. 16-cv-05469-SI, 2017 WL 1436058, at *6 (N.D. Cal. Apr. 24, 2017) ("The Court previously held that plaintiff stated a claim for retaliation based on his allegations that he engaged in protected activity by testifying in court in October 2015 and defendant took various adverse actions against him after his testimony, including cutting off employment negotiations[.]"). Accordingly, Plaintiff has sufficiently alleged that Netflix's alleged failure to negotiate and increase her "opening offer" by straying from its standard practice are employment actions that are "*reasonably likely* to adversely and materially affect an employee's . . . opportunity for advancement in . . . her career." *Yanowitz*, 36 Cal.4th at 1054.

At the very least, Mo'Nique's allegations permit the plausible inference that, had she not challenged her offer as discriminatory, Netflix would have continued negotiating in good faith with her and increased her offer, consistent with its customary practice in dealing with talent in the entertainment industry. *See Id.* at 1052 ("[T]he determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique

circumstances of the affected employee as well as the workplace context of the claim.") And even though Netflix asserts that it is not required to negotiate in a particular way with Mo'Nique or to affirmatively increase her compensation, the fact that "an employer is not legally obligated to provide any 'perks' (such as raises, promotions, and other benefits) to an employee does not mean that an employer may withhold those perks to retaliate against an employee because of that employee's protected activity." *Howard v. Washington*, 254 F. App'x 576, 578 (9th Cir. 2007) (Unpub. Disp.); *see also Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984) ("A benefit that is part and parcel of the employment relationship" even though it is not required by express or implied contract "may not be doled out in a discriminatory fashion, even if the employer would be free under the employment contract simply not to provide the benefit at all.")

Again, the Court notes that Mo'Nique raises a novel theory here, namely that an employer's failure to negotiate an "opening offer" in good faith, consistent with its alleged customary practice which typically leads to increased compensation, constitutes an "adverse employment action" for purposes of a retaliation claim. While Netflix argues that the novelty of Mo'Nique's claim and the absence of on-point legal authority for it should bar her retaliation claims outright (MTD at 12), the Court disagrees. Here, the Court finds that:

> [r]egardless of whether plaintiff will ultimately prevail on [her] claims, dismissing this case under Rule 12(b)(6) is not appropriate. Plaintiff's complaint may raise a novel issue, but that does not justify dismissing it at this stage. The fact that plaintiff's claim[s] 'do[] not fall within the four corners of . . . prior case law does not justify dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals 'are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.'" *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (quoting *Baker v. Cuomo*, 58 F.3d 814, 818–19 (2d Cir. 1995)). Accordingly, because plaintiff's claim may be novel is reason itself not to dismiss it at this stage of the proceedings.

*Brady v. Kuyper*, No. CIV S-06-2298-JAM-CMK, 2008 WL 2951199, at *3 (E.D. Cal. July 25, 2008).

Here, as Mo'Nique points out, Netflix may disprove her allegations on the merits by showing that, as a factual matter, the company never planned to offer her more money than its "opening offer." (Opp'n at 26). But this is a fact-specific

inquiry that that cannot be made at the pleading stage, especially where the relevant facts are within Netflix's knowledge and control. And Mo'Nique's present inability to specifically allege the precise amount of compensation she was allegedly denied by Netflix is not a fatal pleading defect. *Slack v. Int'l Union of Operating Engineers*, 83 F.Supp.3d 890, 907 (N.D. Cal. 2015) ("That Plaintiffs may not know the exact quantum of damages at this juncture does not defeat their claim at the pleading stage.").

Accordingly, the Court concludes that Mo'Nique plausibly alleges an adverse employment action to state a retaliation claim at this stage of the case.

> b. **Mo'Nique plausibly alleges a causal link between protected activity and Netflix's action**

Mo'Nique must also plausibly allege that there is a "causal link" between her protected activity and Netflix's adverse employment action. *Yanowitz*, 36 Cal.4th at 1042; "This causal link 'may be established by an inference derived from circumstantial evidence.'" *Flores*, 873 F.3d at 749 (quoting *McRae v. Dep't of Corr. & Rehab.,* 142 Cal.App.4th 377, 388 (2006)). Mo'Nique can satisfy this prong at the pleading stage by alleging "nothing more than [Netflix's] knowledge that [she] engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *McRae*, 142 Cal.App.4th at 388 (citing *Morgan v. Regents of Univ. of Cal.*, 88 Cal.App.4th 52, 69 (2000)). There is no bright-line rule about timing and, depending on the circumstances, even three to eight months from the time of the alleged protected activity to the time of the alleged retaliatory action can support an inference of retaliation. *See Flores*, 873 F.3d at 750.

First, here it is undisputed that Netflix had direct knowledge of Mo'Nique's protected activity, or her complaint that the company's "opening offer" was discriminatory. Further, Mo'Nique's allegations show that Netflix extended its initial offer on January 11, 2018 (FAC ¶ 60); she then protested this offer in an email (FAC ¶¶ 71–72); and thereafter, on January 17, 2020, her representatives spoke with Netflix's representatives on a call during which Netflix allegedly shut down negotiations and presented its offer on "take-it-or-leave-it" terms, sharply departing from its standard process. (FAC ¶¶ 73, 75). Accordingly, Mo'Nique establishes a plausible inference of casual connection between her speaking out and Netflix's alleged (1) negotiation shutdown and (2) denial of a compensation increase (by converting her "opening offer" to a "best and final" one). Here, fewer than six days elapsed from Mo'Nique speaking out and when the alleged adverse

actions took place. Accordingly, the Court finds that Mo'Nique has plausibly alleged a causal connection between her objecting to Netflix's offer, on the one hand, and an "adverse employment action," or Netflix's purported failure to continue negotiations with her and to increase her pay above the "opening offer," on the other.

### (2) **Mo'Nique adequately pleads a failure-to-prevent retaliation claim under FEHA**

To prevail on a claim for failure to prevent retaliation, a plaintiff must establish three elements: (1) that she was subjected to retaliation; (2) that the defendant failed to take all reasonable steps to prevent retaliation; and (3) that this failure caused the plaintiff to suffer injury, damage, loss, or harm. *See Aparicio*, 274 F.Supp.3d at 1030; *Pinder*, 227 F.Supp.3d at 1141.

Here, Netflix's challenge to Mo'Nique's failure to prevent retaliation claim in violation of FEHA (Sixth Claim, in part) is entirely derivative of, and dependent on, its challenge to her FEHA retaliation claim. *Lattimore v. Euramax Int'l Inc.*, 771 F. App'x 433, 434 (9th Cir. 2019) (Unpub. Disp.) (observing that "failure to prevent discrimination/retaliation claims . . . are derivative of [a plaintiff's] discrimination and retaliation claims") (citing *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 748–49 (9th Cir. 2011)). As described above, Mo'Nique has plausibly alleged that she suffered retaliation, satisfying the first element of the failure to prevent retaliation test. The Court also finds that the allegations set forth in the FAC sufficiently allege the second and third elements of the test. (FAC ¶¶ 145–151).

Ultimately, the Court concludes that Mo'Nique has alleged plausible retaliation claims under FEHA (Fifth Claim and portion of Sixth Claim, for failure to prevent retaliation) and Section 1981 (Eighth Claim).

### IV.  CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Motion to Dismiss in its entirety.

**IT IS SO ORDERED**.